[Crim. No. 522. Fourth Appellate District.—May 27, 1939.]

THE PEOPLE, Respondent, v. JOSEPH FIEGELMAN et al., Appellants.

John S. Cooper for Appellants.

Earl Warren, Attorney-General, and Bayard Rhone, Deputy Attorney-General, for Respondent.

GRIFFIN, J.—In separate informations filed by the district attorney of Kern County, the defendants and appellants were charged with attempted grand theft from the person of one A. F. Hitchcock. Appellant Fiegelman, in addition to the offense described, was also accused of and admitted two prior convictions of felonies. He served two separate terms thereunder in the state prison at San Quentin. After pleas of not guilty to the charge were regularly entered, the cases were consolidated for trial before a jury which returned verdicts of guilty. This appeal is prosecuted from the judgments of conviction and from orders denying their motions for a new trial.

This appeal concerns the sufficiency of the evidence, the sufficiency of the informations, and the propriety of the charge to the jury. The appellants were charged with attempted grand theft substantially as follows: That on October 1, 1938, they "did wilfully, unlawfully and feloniously attempt to take from the person of one A. F. Hitchcock, a purse containing approximately Six Dollars ($6.00) in money, lawful money of the United States of America, and of the personal property of one A. F. Hitchcock; . . . "

On October 1, 1938, there was an annual Frontier Day Parade and rodeo in the city of Bakersfield. Two police officers were assigned to protect the Frontier Day crowd against pickpockets. Two officers in plain clothes arrived at the corner of Nineteenth Street and Chester Avenue in downtown Bakersfield, at about 10 o'clock A. M. The appellants

Moser and Fiegelman were standing on the corner of Nineteenth Street and Chester Avenue. Moser "was looking in almost every direction except the one from which the parade was coming". There was quite a crowd of people on the corner. One of the officers testified that he watched the appellants for about five minutes after he first noticed them. During this time Moser nodded to Fiegelman several times and once Fiegelman and Moser approached each other in the crowd and exchanged a few words, and then separated and went back to their previous positions. Moser at that time was wearing either a blue or a gray suit and a gray hat, and Fiegelman wore a blue serge suit. Fiegelman was carrying his coat over his left arm, although he changed arms occasionally. At that time an old gentleman, A. F. Hitchcock, came walking west on Nineteenth Street, making his way to the east curb line of Chester Avenue. The appellants exchanged nods, and Moser slipped through the crowd and reached the curb line ahead of Hitchcock, who was proceeding through the crowd. Fiegelman moved up behind Hitchcock. Moser changed from one foot to the other and "sort of shifted and hesitated and backed and filled". The officers approached the appellants and Hitchcock. Appellant Fiegelman had his right hand in Hitchcock's left hip pocket. The coat was hanging over his left arm, and the fingers of his left hand were holding the pocket slightly open. At that time the officer showed Fiegelman his badge and placed him under arrest.

The scene was reenacted in the courtroom before the jury with the aid of the bailiff and others. It appears from the record that the finger-tips of the left hand were in the pocket, and three fingers of the right hand extended about three or four inches into the pocket. The fingers of the right hand were wiggling. On the way to the police station the officer asked the appellant Fiegelman about the appellant Moser, and Fiegelman replied that Moser was not with him, that he was a stranger to him, and he did not know why he (Moser) was being arrested.

The other officer testified substantially the same, although he placed the time as being fifteen minutes during which they had watched the appellants.

Hitchcock testified that he was at the corner of Nineteenth Street and Chester Avenue between 10 and 11 o'clock A. M of that day, and that at the time appellants were arrested

he was informed by police officers that someone had attempted to pick his pocket. He was then carrying five or six dollars in his purse in his left front pocket. On cross-examination he testified that he did not know whether anybody was in front of him or not; that he was working his way through the crowd which was awfully thick; and that he had to keep looking down to keep from running into someone; that he could not see very well, and had to keep his head down to keep from stepping on someone; that he did not feel anyone putting his fingers in his pocket; that his sense of touch was all right but he was pretty hard of hearing.

Appellant Moser testified that on October 1, 1938, he had no occupation; that he was acquainted with appellant Fiegelman and had known Fiegelman's father since 1923; that appellants left Los Angeles for Bakersfield on September 30th; that Moser was going to Montana to take care of a civil law suit; that appellant Fiegelman was bound for San Francisco where he had a job arranged at a cleaning establishment; that they left Los Angeles about 7 o'clock in the evening and arrived in Bakersfield about 10 o'clock that night; that they then had a bite to eat and registered at a hotel and retired about 11 o'clock P. M.; that Moser registered at the hotel while Fiegelman was putting his car away; that they left the room at about 9 o'clock A. M. October 1st; that they first went to a restaurant and had breakfast and noticed as they were leaving the restaurant that it was about 10 minutes to 10 o'clock. Moser testified that he then wanted to go to the bank and inquired as to the whereabouts of the bank because he wanted to change some small bills into larger ones so he could put them in his purse and it would not be so bulky. He stated that he thought he had about $140 at the time. He testified further that he inquired about the bank and was told that it was across the street in the next block; that he arrived at the corner of Nineteenth Street and Chester Avenue, where there was a large crowd of people; that he asked someone why there was such a crowd and was informed that there was going to be a parade at 10 o'clock; that they then stood around the corner a few minutes waiting until 10 o'clock. He acknowledged that the two of them were separated a little and that the crowd was pushing around, and apparently the crowd didn't know whether the parade was coming up one street or another and that he was standing there when he was arrested.

On cross-examination he testified that he had known the appellant Fiegelman casually for several years. It also appears that at the time of Moser's arrest he had a memorandum on his person which contained a list of parades and other festivals which were to be held in California.

The appellant Fiegelman testified that prior to October 1st, he had been living in Los Angeles, where he was employed as a tailor in a cleaning and dyeing establishment. His testimony is practically the same as Moser's testimony.

Appellants contend that the evidence was insufficient to sustain or justify the verdict and judgment and that there was and is a fatal variance between the information, proof, verdict and judgment, and claim that the proof shows, in viewing the evidence most favorable to the prosecution, only an ineffectual effort to pick or take property from an empty pocket on the person of one Hitchcock, and that the information charges no such offense. It is argued that by reason of the fact that the evidence established that there was no money in the particular pocket at the time, it would be an absurdity to hold that a person could attempt to steal that which is not there to be stolen, citing *State* v. *Mitchell*, 170 Mo. 633 [71 S. W. 175, 94 Am. St. Rep. 763]; *People* v. *Murray*, 14 Cal. 159; *People* v. *Miller*, 2 Cal. (2d) 527 [42 Pac. (2d) 308, 98 A. L. R. 913]. ▆ It is further argued that where the allegation is made in the information that the attempt was to steal certain property, the proof must follow the information and such an attempt must be shown. It is the felonious taking of property "from the person of another" that constitutes grand theft, and not the taking of any specified amount from the person nor taking the property from any specified place on the person. (Sec. 487, Pen. Code.) The information sufficiently alleges this fact.

▆ The case of *People* v. *Miller, supra,* cited by appellants sets forth the elements of attempt, i. e., (1) a specific intent to commit the crime and (2) a direct ineffectual act done towards its commission. It is there stated also that a mere intention to commit a specified crime does not amount to an attempt, nor is mere preparation alone sufficient, but there must be something more than mere menaces, preparation or planning.

▆ The overt act need not be the last proximate act to the consummation of the offense attempted to be perpetrated,

but it must approach sufficiently near it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made. Whenever the design of a person to commit a crime is clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime. It would be useless to attempt to lay down any rule by which an act might be characterized as overt or otherwise in a particular case. General principles must be applied in each case as nearly as can be, with a view to working out substantial justice. The question of what overt act is sufficient to constitute an attempt to commit a crime has been the subject of much discussion by both text writers and courts, and there is some conflict in the decisions. In the early English cases the view seems to have been adopted that to constitute an attempt the overt act must be the final one towards the completion of the offense, and of such a character that unless it had been interrupted, the offense itself would have been committed. This extreme doctrine has not been accepted in this country and certainly not in this state. But assuming that mere preparation is not in all cases an attempt to commit the crime, it is well settled in this country that it is not necessary to constitute an attempt that the act done should be the last proximate one for the completion of the offense.

It is the condition of appellants' minds and their conduct in the attempted consummation of their design which determines whether there was an actual attempt to commit the crime. Here appellants did their utmost to effect the consummation of the crime intended by them. They failed only by reason of a cause or causes not previously apparent to them.

"It is a well-settled principle of criminal law in this country," says our Supreme Court in *People* v. *Lee Kong,* 95 Cal. 666, at 668 [30 Pac. 800, 29 Am. St. Rep. 165, 17 L. R. A. 626], "that where the criminal result of an attempt is not accomplished simply because of an obstruction in the way of the thing to be operated upon, and these facts are unknown to the aggressor at the time, the criminal attempt is committed. Thus an attempt to pick one's pocket

or to steal from his person, when he has nothing in his pocket or on his person, completes the offense to the same degree as if he had money or other personal property which could be the subject of larceny."

We cannot conclude that the evidence is insufficient because the victim's money was in his front pocket. We are thoroughly convinced that appellants' argument must be rejected as untenable and that the evidence in the instant case establishes the inescapable corollary and the conclusion is irresistible that the attempt to commit the offense has been sufficiently charged and that the offense as pleaded has been sufficiently established and comes well within the rules laid down in the cited cases. (See, also, 14 Am. Jur. 817; *In re Magidson,* 32 Cal. App. 566 [163 Pac. 689, 17 L. R. A. 626]; 17 Cal. Jur. 879; *People* v. *Miller, supra; People* v. *Cloud,* 100 Cal. App. 792 [281 Pac. 79].)

█ Complaint is also made that the court erred as a matter of law in instructing and failing to instruct the jury. The instruction given on the question of attempt was as follows:

"An attempt to commit a crime consists of two elements; namely, the intent to commit it, and the direct, ineffectual act done towards its commission. In other words, there must be a unity of intent and overt act. (16 C. J. 113, sec. 92; 8 R. C. L. 277, sec. 294.)

"There is a difference between the preparation antecedent to the offense and the actual attempt to commit it. The attempt' is a direct movement toward the commission after preparations are made and must be manifested by acts which would have ended in the crime if not interrupted. Whenever the design of a person or persons to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt. (21 L. R. A. (N. S.) 898.)

"It is immaterial whether or not the crime attempted was impossible of completion if you find that is was apparently possible of completion to the person or persons so acting with the necessary intent."

Appellants' objection is directed to the fact that this was the only instruction given which had reference to the law of attempt, citing *People* v. *Miller, supra,* in support of their contention that the given instruction was not sufficient. The instruction given in the Miller case, which was held insufficient, lacks many of the qualities of the instruction given

in the instant case. This instruction sufficiently defines the elements of an attempt to commit a crime. We have examined all instructions given and refused and reach the conclusion that the jury were properly instructed as to the law and that the evidence is sufficient to uphold the findings and verdicts of the jury.

The judgments and orders appealed from are affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 5, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 26, 1939.