[Crim. No. 5254. Second Dist., Div. Two. Apr. 29, 1955.]

THE PEOPLE, Respondent, v. JAMES FRATIANNO, Appellant.

Louis Thomas Hiller for Appellant.

Edmund G. Brown, Attorney General, William E. James and Jay L. Shavelson, Deputy Attorneys General, for Respondent.

MOORE, P. J.—From a judgment convicting him of conspiracy in violation of section 182 of the Penal Code and of attempting extortion in violation of section 524 of the same code, appellant now demands a reversal on the grounds of the insufficiency of the evidence to support the judgment, errors in rulings, errors in giving and refusing instructions, errors in the admission and exclusion of evidence.

### THE EVIDENCE SUFFICIENT

Prior to the events about to be recited, one George Terry had incorporated the Terry Drilling Company and was

its president and principal stockholder. The corporation owned 35 per cent interest in 800 acres of Tapo Canyon in Ventura County and was one of the general partners in the copartnership of "Terry and Jansen" which held a lease from the Tapo Oil Company, a California corporation. The partnership acquired the lease from the last named corporation December 4, 1952, and soon thereafter began to drill. Oil was discovered February 16, 1953. The success of the undertaking was acclaimed in the press.

The witness Riddell was a friend of Terry and a stockholder in the drilling company. The defendant Raspona had been an acquaintance of Terry about four years. He operated a liquor store in Burbank. Terry visited the store and at one time in 1950 leased a drilling rig to Raspona, but had no other transactions with him. About February 20, 1953, pursuant to the merchant's request, Terry paid a visit to the liquor store when Raspona inquired of Terry whether the latter knew of any royalty for sale in the discovery well. Terry knew of a Mr. Lopspeich who had a 2 per cent overriding royalty that he might be interested in selling "and I told him I would see him and let him know." Raspona said he had some people with $5,000 who wanted to buy some royalty in a well.

After talking with Mr. Lopspeich, Terry discussed the matter with Raspona near his liquor store and told him that "this royalty deal had already been sold and that there was nothing available up there." Raspona repeated that some "mighty fine people were interested with him."

About July 9, 1953, Raspona and a party called "Ray" stopped near Terry's office and Ray said, "I want to talk to you, personally." He said nothing more, but Raspona asked Terry to "come to my place tomorrow." Prior to such meeting Terry had not seen or conversed with Raspona since their conversation about February 20. Although, prior to the trial, Terry had heard the name Fratianno, he had met neither Fratianno or Modica.

The royalty sought by Raspona and his codefendants was a "two per cent overriding royalty" in this Tapo 435 acres under lease to the partnership, worth $25,000.*

---

*Terry explained that "a royalty is an interest in a leasehold estate." There are usually two kinds of royalty: overriding and participating. "An overriding royalty bears no part of any expense attached to the operations of the lease. It is a certain percentage of the gross income from production of oil and gas. A participating royalty is one that bears its proportionate share of the operating expenses connected with the production and sale of the oil."

Appellant appeared greatly concerned about acquiring the royalty. After the foregoing events, he telephoned Terry that he was "Jimmy Fratianno" and wanted to see him. They did not meet.

Besides his friendship for Terry and his holdings in the Terry Drilling Company, Carl Riddell was an independent driller and knew Raspona and Modica. About April 27, 1953, Riddell, at their request, met Raspona and Modica at the latter's store. Raspona told Riddell he had a deal with Terry and that $5,000 had been put up by appellant's friends; that appellant had represented the people who had put up the money and Raspona stated that he felt appellant might think he (Raspona) had taken the money, and would not deliver any percentage or any deal he might have with Terry because it had suddenly become good. Raspona asked Riddell to tell appellant and Modica that he was not the kind of character that would take their money and not deliver. Five thousand dollars was mentioned. Appellant stated that he was known as "the Weasel" and asked Riddell (1) for assurances as to Raspona and (2) to arrange a meeting with Terry.

In further numerous conversations with Raspona and appellant, the former insisted that Riddell had promised to arrange a meeting for him and Terry; that Terry had been evasive about meeting him and appellant and that he was worried for fear that "these people" meant business and might take Terry out and "shake him out of it." Raspona told Riddell that "These people would blow Terry's and my head off if I did not make contact with Terry and straighten the thing out; that they had a 'net work' all over the country and could fix things if anybody got into trouble and he said it would be lots of trouble if this contract wasn't made and this so-called deal completed." He told Riddell that he "had better arrange the meeting or they would blow his head off and, that if he resorted to the law, he would be killed."

Riddell had another conversation with Raspona about August 6, 1953. Riddell had received a call from appellant. He informed Raspona of the call from appellant who told Riddell he allowed no one to talk about him. Riddell drove down to the liquor store and told Raspona of his telephonic call from appellant and that he wished to come down and straighten the thing out. He met Raspona in the liquor store and they sat in "the car" while they visited. Riddell told Raspona that appellant had called him and said that he was

going to blow Riddell's brains out; that he did not allow people to talk about him; that he had come to get Raspona to straighten appellant out.

When Riddell complained to Raspona of appellant's threats and appealed to Raspona to get him out of the situation, Raspona stated to Riddell that appellant was determined to go through with this deal; that no one could stop him and that "these people" had a network and even the police were fixed, and that "the best thing to do would be to get Terry to go through with the deal."

On August 7, 1953, appellant with profane and obscene language threatened to Riddell to "blow Riddell's head off."

On August 8, 1953, the police installed sound recording equipment onto Riddell's telephone. Commencing on the evening of August 9, the several tape recordings of the conversations of defendants were made. The substance of such conversations is convincing proof that defendants had a common understanding and were attempting in unison to terrorize Mr. Riddell and his family into action and to force him to induce Terry to assign to them an overriding royalty on the Tapo lease.

The following is taken from such conversations:

RASPONA: "I'm just going to have to straighten this thing out, Carl. I don't want nothing happening. Your wife called yesterday, worried sick. I don't know why. I know they're not going to touch kids, for Christ's sake . . ."

RIDDELL: "Why talk about kids . . . what am I supposed to do. This guy called me up. He's splitting my head open. He's going to crucify me . . . I either have to have him arrested or go kill him . . . I know, but when they start threatening my family Don, what am I going to do? . . ." "here is this Fratianno. What does he want from me? What's his deal?"

RASPONA: "When we had that talk out there in that God damned liquor store . . . you said: 'I'll make a date. I'll get hold of him and we'll set down and talk like people.' Remember—your exact words, Carl? . . . Now, he feels that the least you could do, was to make a date and then when Ray went down there with me . . ."

RIDDELL: "Who's this Ray?"

RASPONA: "Oh, well, Christ, he's that big guy, Carl. You know that big heavy-set kid . . . So, its just a' case of this, Carl. The man gave me money because I told him he was going to get in on a good thing . . . the man stayed away

and he didn't call. He comes back into town. He is ready to blow my head off because the deal is a success and I got his money in my pocket . . . Then he has to go out of town again and he comes back in, wondering why he's still not in. It's just like you . . . you want to put in five G's in that damned Tapo Canyon and I'm supposed to do it and you think you're in and then you're out, and you'd be God damned mad, too, and its just a simple thing.''

RIDDELL:·''I know nothing of this. Why should they keep threatening me? My wife is all upset. Helen is blowing a fuse . . . She's hollering now. She wants to talk to you.''

Mrs. RIDDELL: ''Don? . . . What's this all about?''

RASPONA: ''. . . As far as Carl is concerned, honey, he's stepped on forty people's seat [sic] . . . If the man would only put himself out and get with this dirty son-of-a-b'ing George Terry . . . The deal is this, honey. I was supposed to put some money into this well before it even come in, with Terry on an override . . . It winds up that Terry double crosses me like he does other people, and he's double crossed other people, 'jillions' of times and . . . the wind-up is that this man figures his money is in the deal. He leaves town. His own business comes back and for Jesus Christ, his money is not in the deal. I called Terry. He don't call me back. He don't do nothing. He was going out to see that I got the override and everything else. So Carl comes out to meet these people and try to help me out and tell the people that the money has not been put up . . . that I don't have any override on it. They feel that I took the God damned money, bought the override, and that I'm getting the money and they're left out . . . I want to see what the hell happened and why my investment wasn't put in. They blamed it onto me, for Christ's sake . . . Hell, I made George Terry money. I gave him a couple of thousand for my little company, for Christ's sake. I gave him my Cadillac five or six hundred below wholesale.'' ''Carl, there's nobody going to get hurt . . .''

RIDDELL: ''Well, that isn't what you told me the other day, Don.''

RASPONA: ''Do me a favor. Why don't you come down tomorrow morning . . . Get in my car, let's go down to that God damned office. Let's talk to that guy. I'll say 'Look, here is the man responsible! Leave Carl and his family alone.' Let's go down there and wait and this way I can say you went with me . . . Listen, Carl, do me this favor.

If you want it over right now, it is at home, get with him and call me back. Get with him and come on down to my God damned liquor store right now and I'll end this whole God damned thing.''

Raspona took the position that only Terry was at fault and promised to have appellant apologize to Riddell.

Subsequently, Raspona rebuked Terry for not seeing appellant. When Terry replied that he had dealt with Raspona only, the latter said, ''Well, you are going to know them . George, I'll guarantte you that . . . You are going to know them . . . you'll soon find out who they are . . . Its just people don't want 'no' for an answer . . . I'll tell you one thing, get your best hold, George.''

TERRY: ''Give the man his money back whoever he is. I don't know him, but I suppose they are going to be threatening me now.''

RASPONA: ''Well not only that, but even worse than that will happen and they don't even give a God damn . . . That's the kind of people they are, but its not only one man, George, its an awful lot of men . . . Well, now, he's here to stay a while and so now they're going to bring trouble, that's all . . .''

TERRY: ''What kind of trouble?''

RASPONA: ''Well you'll find out, Buddy. You've never had trouble until you deal with people like this, Carl knows . . .''

TERRY: ''And there was nothing left for sale . . .''

RASPONA: ''All right, then. There's nothing left for sale, George. Yes. Then, grab your best hold because you're in for a rough time. God damn it. I can't speak any plainer than that can I?''

At a later time Terry asked why they wished to meet him.

RASPONA: ''Well, they want to find out why the hell they didn't get the percentage, and you're going to meet with them one way or another. I guarantee you that, George. The S O B has followed you to Carl's house . . . You think you are not in for trouble? I'm trying to help you, boy . . . but these Goddamned people don't know that. They don't care if Carl knows the man's name or anything else. They don't give a Goddamn. They'd defy Christ, that's the kind of people they are. I'm just trying to help you, George . . . For Christ sake, a ten or fifteen minute drive and talk to

the God damned man and maybe we can settle the God damned thing."

Following the foregoing, Riddell took the telephone. Raspona said he would tell the people that Terry would not meet them and told Riddell to tell "that stupid idiot" to grab his best hold. He then put Modica on the telephone and he told Riddell to get himself "squared around"; said appellant would not listen to him because of the attitude of Terry.

Appellant was evidently restless to be in the conversations. He called Riddell on the telephone and continued as follows:

FRATIANNO: "Understand? I want to be a man with you and a man with Terry. Now this has gone far enough . . . We put up our money. People are talking. Now I ain't going to stand for it. Now, I'm going to tell you another thing. As far as Terry is concerned I don't give a —— ——. People can go to the police all they want. The police is not going to watch him 24 hours a day, 365 days a year."

RIDDELL: "Yeah."

FRATIANNO (with obscenities omitted): "If the —— go to the coppers for me, he's going to die. I'll tell you right now, I'm plenty mad. I want to be a man and I want that other —— to be a man, because his —— money ain't going to do him no good when he's dead. Now you tell him. You put him on the phone with me, Carl. You tell Terry I want to talk to him. Will you put him on the phone?"
Terry was then called to the telephone.

FRATIANNO: "Let me tell you something, Terry. Now we're not going to get —— on this thing. You know that, don't you?"

TERRY: "I didn't know I had any deal with you."

FRATIANNO: "Well, I had a deal with Don and you had a deal with Don. Is that right?"

TERRY: "I started the deal with Don and told him that the deal was off."

FRATIANNO: "You did tell him? Well, look Terry. Its not off with me and I'm going to tell you one —— thing and I don't give a —— who knows it, coppers or no coppers. I'll blow your —— —— head off. I'm going to tell you right now, you ain't —— with no kids."

TERRY: "Well, I never met you in my life."

FRATIANNO: "You ain't going to meet—you don't have to meet me, Terry, because you ain't going to know me,

and I'm going to tell you, you'd better straighten this ——— thing our and straighten it fast. I'm going to give you one ——— week to straighten it out and if you don't straighten it out in one ——— week, you ———, you could have people following you the rest of your ——— life, and I'll blow your ——— ——— head off. All your money ain't going to do you no ——— good. . . . You, Carl and Don straighten this ——— thing out and straighten it fast.''

When Riddell took the telephone receiver, appellant told him he had given Terry just seven days to straighten the thing out and told Riddell to help.

Raspona told Riddell that appellant had given him $5,000 to buy into the oil deal and he would not accept the money back now that the deal was a success. When Riddell told Raspona that the other shareholders of the Terry Drilling Company would interfere, Raspona said: ''If there's any ——— stockholder who interferes, there won't be no ——— stockholder interfering. I'll guarantee you his heirs won't interfere and . . . if there's any S O B tries to hold up any ——— deal and I know it and I pass it on, there ain't no S O B going to hold up no deal . . . Anyone who tries to interfere will be called by 'the people' and the corporation commissioner can be fixed.''

The jury were justified in believing that the threats made by Raspona and appellant and especially the threat to blow Terry's head off induced both men to fear for their safety. Also, Terry was in fear from his conversations with both such defendants. The men were driven by a consuming ambition to acquire an interest for $5,000 that would pay them $8,800 in six months' time.

From the foregoing recitals, the hope of reward, the savage zeal of defendants, their stealth, their secret meetings, their common theme and their unanimity in striving to force Terry into a compliance with their demands, the conclusion is unescapable that they had formed a criminal conspiracy. Not only was Raspona a close personal friend of Modica, but had assisted him in establishing a liquor store. Also, Modica had known appellant for nearly 30 years and appellant had known Raspona for over 20 years before the oil discovery in Tapo Canyon. They were interested in common in acquiring an advantageous investment in the lease to the partnership. According to his own testimony, Raspona had Terry's promise to sell him a 2 per cent overriding royalty for $5,000 and a Cadillac automobile. He communicated news

of such fact to Modica who paid $2,500 to appellant who in turn delivered the $5,000 to Raspona. The three men evidently agreed that one-half of the royalty should go to Raspona and the remaining 1 per cent should be divided equally between Modica and appellant. But no substantial basis existed for the speedy consummation of a sale by Terry. He had given no definite promise to Raspona, and the latter had paid nothing towards such a purchase. But having united their moneys in one pool and having cheerily agreed among themselves upon the investment, they resolved not to be dissuaded by Terry's reticence. They invoked all available forces to drive through an imaginary deal.

In April 1953, they urgently invited Carl Riddell, an associate of Terry, to meet with them at Modica's store where the trio poured into Riddell's ear the fantastic tale that Terry had agreed to sell the 2 per cent royalty on the 455-acre lease and requested Riddell to effect a meeting of themselves with Terry. It was Riddell's first meeting with appellant who had come to the store with one "Ray." After Raspona had explained that he "had some sort of a deal with Terry and that Fratianno had represented the people who had put up the money," Raspona asked Riddell to tell appellant that he was not the kind of character that would take their money and keep the royalty for himself. Thereupon, appellant invited Riddell to a private audience at which he asked Riddell to arrange a meeting with Terry and Raspona. The only promise of Riddell was that he "would endeavor to convey the message to Mr. Terry" when he saw him. He told appellant the latter could call Terry on the telephone.

At a subsequent conversation, Raspona rebuked Riddell for his failure to arrange the meeting with Terry and imparted to Riddell the threats of appellant and Modica that they would blow off the heads of Riddell and Terry unless they straightened out the matter of conveying the royalty interest. Also, he emphasized the power of his confederates by his references to their "net work" throughout America and to their ability to make trouble. By such admonitions to Riddell, a definite attempt was made to drive fear into the hearts of Terry and Riddell by causing them to believe in the power and ruthlessness of Modica and Fratianno.

Some weeks after the last mentioned conference, appellant telephoned Riddell that he would blow Riddell's head off; that he (Riddell) had not arranged the meeting with Terry

and had been talking about him and that he would blow Riddell's "—— —— head off his shoulders." At the same time, Modica injected his advice to Riddell and Terry to worry about themselves.

After the conspirators had cursed their volleys of verbal flame into the consciousnesses of Terry and Riddell, Raspona attempted to induce the oil operators to accede to the demands of his codefendants. Such action, combined with the common behavior and the use of vile epithets, their evident concurrence in a program of intimidation, their use of identical methods of approach and their unanimous demand for the same thing—these exclude all reasonable doubt of the conspiracy of the three men. (See *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) ▬ ". . . it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design (5 Cal.Jur. 521), and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts . . . nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy." (*People* v. *Steccone,* 36 Cal.2d 234, 238 [223 P.2d 17]; 11 Cal.Jur.2d 252.) If in their endeavors to achieve the same end, the defendants pursued a common purpose by their several, respective acts, each contributing his part, the jury is warranted in concluding that all were involved in a conspiracy to effect a common object. (*People* v. *Curtis,* 106 Cal.App.2d 321, 327 [235 P.2d 51]; *People* v. *Bentley,* 75 Cal. 407, 409 [17 P. 436].) ▬ When one conspirator undertakes to do some act for the purpose of effectuating his agreement with his confederates and thereby assents to the criminal compact, either by words or deeds which imply his assent, evidence of such facts which form a part of the transaction under investigation is admissible. (Code Civ. Proc., § 1850; *People* v. *Collier,* 111 Cal.App. 215, 240 [295 P. 898].) ▬ Paraphrasing the language of Justice Works, the brilliant jurist who once presided over this court: the purpose of the evidence in conspiracy cases is to establish a mental state—an illicit concord of minds of several persons. The jury is entitled to consider every fact which has a bearing on the ultimate fact in issue. ▬ There is no valid objection to evidence which tends to show, step by step, the gradual formation of a criminal concord in the minds of those accused,

merely because the evidence begins at a time long anterior to the wrongful meeting of minds. "It is necessary only that the evidence, in all its parts, tends to prove the formation of the conspiracy . . . 'From the nature of the crime itself it is difficult to prove a criminal conspiracy by direct evidence, and such conspiracies are almost always proven by circumstantial and "piecemeal" evidence'. . ." (*People* v. *Stevens,* 78 Cal.App. 395, 407 [248 P. 696]. See *Allen* v. *United States,* 4 F.2d 688.)

"Where . . . the facts from which the conspiracy is to be inferred, are so intimately blended with other facts going to constitute the crime that it is difficult to separate them, it is not essential to the introduction of evidence of the acts and declarations of one of the conspirators that evidence should first be introduced to establish *prima facie,* in the opinion of the court, the fact of the conspiracy." (*People* v. *Ferlin,* 203 Cal. 587, 599 [265 P. 230].) The order of receiving the evidence is to be controlled in the sound discretion of the court. (*People* v. *Sica,* 112 Cal.App.2d 574, 584 [247 P.2d 72].) It is not unreasonable for a court to find the existence of a conspiracy from the acts of the accused confederates in trying to effect an unlawful purpose. (*People* v. *Torres,* 84 Cal.App.2d 787, 794 [192 P.2d 45].) While the existence of the conspiracy should under the statute (Code Civ. Proc., § 1870) ordinarily precede proof of the acts, that rule is not unyielding. Merely for the sake of convenience, evidence of the acts and declarations of an alleged conspirator is admitted before sufficient proof of the conspiracy has been received. (*People* v. *Sica,* 112 Cal.App.2d 574, 584 [247 P.2d 72].) Also, proof is not required to show that the alleged conspirators met together and entered into an explicit agreement to commit the crime or that the conspiracy was expressed in words. "If in any manner the conspirators tacitly come to a mutual understanding to commit a crime it is sufficient to constitute a conspiracy." (*People* v. *Yeager,* 194 Cal. 452, 484 [229 P. 40].)

SUFFICIENT PROOF OF ATTEMPTED EXTORTION

Appellant churns throughout the pages of his brief that the evidence proves not an attempt to commit an extortion, but a mere preparation for the commission of that crime. We find in the record much more than "mere preparation." Not only did the defendants entertain a specific intent to commit the crime of extortion, but they performed direct acts

to effectuate such intent. (*People* v. *Fiegelman*, 33 Cal.App. 2d 100, 104 [91 P.2d 156].) Thereafter, they were frustrated by an external force. ██ "Whenever the design of a person to commit a crime is clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and commonsense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime." (*Ibid.* 105) ██ Not only did defendants make threats to force the arrangement of a meeting but the demands made upon Terry through Riddell, the direct threats to Terry by the telephonic calls on both men constitute acts unequivocally directed to the achievement of their single aim, namely to acquire for $5,000 a property worth many times that sum. Raspona told Terry, "It's just people don't want 'no' for an answer." When Terry inquired why others wished to see him, Raspona replied: "They want to find out why the hell they didn't get the percentage, and you're going to meet with them one way or another. I guarantee you that, George. The —— has followed you to Carl's house." After Riddell had complied with Raspona's request and put him in contact with Terry, the latter was serenaded almost daily by Raspona's repetitious hum of appellant's ruthless character. Modica told Riddell to get himself "squared around" and to "worry about yourself" and to "tell that other idiot —— to just worry about himself, too." As the conferences of the conspirators grew in number and ferocity, appellant's boldness waxed in bitterness until he at last announced to Terry he might have one week "to straighten the matter out; the deal was not off with him." Shortly thereafter, Raspona advised Riddell to tell Terry "to dig up what the —— he can"; that as to himself, he was willing to forget the royalty but that those who had put up the money insisted on acquiring their 2 per cent interest. He wanted his "—— 2 per cent in that —— joint or there's not no —— going to enjoy one —— minute of it." In the course of Riddell's conversations with Raspona, he once said that Terry could not convey an interest without the consent of other shareholders. To that Raspona with mounting vulgarity and woeful promise, replied: "If there's any —— stockholder who interferes there won't be no —— stockholder interfering. I'll guarantee you his heirs won't interfere, not no —— stock. If there's any —— tries to hold up any —— deal and I know it and I pass it on, there ain't no —— going

to hold up no deal.'' When asked what Terry could do to escape a clash with defendants, Raspona told Riddell: ''Give him the two per cent . . . You can't give him nothing but 2 per cent. Believe me, that —— [referring to appellant] when he makes up his —— mind, the Pope couldn't stop him . . . I'll bet a thousand Fratianno could clear the transaction with the Corporation Commissioner. I'm sitting here tonight and the guy calls me and tells me that this is the eighth well they have brought in.''

Such declarations by men of the character disclosed by this record were not the indices of child's play. The jury were warranted in finding that they were the overt acts of malicious men bent upon a sordid crime, resolved to achieve their purpose, to take what did not belong to them. Terry was in fear and might have been victimized but for the timely interference of the police. The dramatic performance of appellant as above described clearly constitutes an attempt to perpetrate the crime of extortion. (*People* v. *Fiegelman*, *supra*.) ▮ It is sufficient proof of an attempt to commit a crime where it is shown that the efforts of the accused ''reach far enough toward the accomplishment of the intended offense to amount to the commencement of its consummation.'' (*People* v. *George*, 74 Cal.App. 440, 449 [241 P. 97].)

### The Attempt Was Actionable

Appellant's argument that the acquisition of the 2 per cent overriding royalty in the 435-acre lease was impossible is as vain as his attempt to evade the wily arts of the police. Either more skill in the minds of the defendants, or less stamina in the hearts of the proposed victims and their scheme would have triumphed. The Terry Drilling Company had leased only 435 acres of its 800 in Tapo Canyon to Mr. Terry and his partner James Jansen. While that partnership was known as Terry and Jansen, the Terry Drilling Company and Jansen were the general partners and they had five limited partners. Had Terry been subjected to sufficient force, he could have caused the 2 per cent to be assigned by exercising his power as a partner in Terry and Jansen and by virtue of his control of Terry Drilling Company, assisted by Riddell, a holder of a large block of the stock in that corporation. After discovery of oil in Tapo Canyon, the assignment of a 2 per cent interest might readily have been effected by the payment of comparatively small sums to the other partners in Terry and Jansen. But even though Terry had found it impossible

to convey the 2 per cent override, that would not have been the impossibility which precludes actionable attempt. The defense of impossibility means a legal impossibility. Where the accused person believes he can accomplish the crime he intends to commit, his inability to do so does not erase the existence of his attempt and his guilt is just as deeply dyed as if he had achieved his purpose. (*People* v. *Lee Kong*, 95 Cal. 666, 668 [30 P. 800, 29 Am.St.Rep. 165, 17 L.R.A. 626].) ". . . slight acts done in furtherance of that design will constitute an attempt . . ." (*People* v. *Fiegelman, supra,* 105.)

### THE TELEPHONIC CONVERSATIONS

Admission of the telephonic conversations is assigned as prejudicial error. Appellant contends that extrajudicial statements are not admissible against coconspirators until the fact of the conspiracy shall first have been established by independent evidence. The recorded telephonic conversations were admitted, not to show their substance, the truth or falsity of them, but to prove that the statements were made; that a common purpose inheres in all of them and that each conspirator had knowledge of the interest, activities and statements of all the others. The rule requiring proof of the corpus delicti before receiving extrajudicial confessions is an importation into American jurisprudence. Its meaning is that admissions of the accused outside of court without corroboration are not sufficient to support a conviction. But the courts of this state have applied it to the statements of the accused, admitting the truth of a matter other than the actual fact charged and not in itself constituting an essential element of the crime. (19 Cal.Jur.2d § 493.) The California rule applies only to those statements which are relevant because they admit guilt. It does not apply where the extrajudicial statement is relevant by reason of its utterance, regardless of its veracity. How else could such crimes as extortion be proved without proof of the utterances of the accused? It is difficult to conceive of proof of such a crime without some evidence of the talk of the accused prior to his trial.

 In the matter at bar, a conspiracy was shown to exist by the several statements made to Riddell and to Terry by each of the defendants, and by their conduct; no hearsay is involved. Inasmuch as the contents of the recorded conversations are relevant to the issues involved and they are not

hearsay, it was not essential to prove the fact of conspiracy before admitting evidence of the extrajudicial statements.

Appellant cites numerous authorities in support of his thesis that the records were inadmissible in the absence of independent evidence of the conspiracy. (*People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17]; *People* v. *Busby,* 40 Cal.App.2d 193 [104 P.2d 531]; *People* v. *Besold,* 154 Cal. 363 [97 P. 871], etc.) But not one of them involves extortion or a crime done with words only. In each, the extrajudicial statement was purely hearsay and was offered to prove the truth of the matter itself.

### GIVING AND REFUSING INSTRUCTIONS—NOT ERROR

■ Appellant assigns as error the court's rejection of his proposed instructions 15, 17, 19, and 21. They deal primarily with the common presumptions of veracity and innocence. All they contain were substantially included in the instructions given. (Court's instructions 8, 9, 21, 22.) ■ Proposed 17 is not legally accurate. It would have told the jury that in considering a defendant's testimony to disregard the fact that a defendant is interested in the outcome. ■ The court's instruction 9 told the jury that any witness is presumed to speak the truth but to consider the witness' relation to the case in weighing his testimony. This was a correct instruction. (*People* v. *Jailles,* 146 Cal. 301, 307 [79 P. 965]; see CALJIC 52, alternate.) Proposed instructions 19 and 21 dealing with the presumption of innocence are abundantly covered by the court's instructions 8, 21 and 22.

■ By a proposed instruction the court would have told the jury to ''decide separately the question of the innocence or guilt of each of the several defendants'' etc. Such would have been misleading in a prosecution for conspiracy where the acts of any defendant during and pursuant to the conspiracy are binding on all. The court had already instructed that ''as to each defendant you must determine whether he was a conspirator.'' Therefore, the proposed instruction would have been confusing and not in point. ■ The law is that once a criminal conspiracy is established, the acts of any conspirator committed pursuant to the conspiracy and while it exists are binding upon all the accused. One of the court's instructions directed the jury fully to consider the guilt or innocence of each defendant.

■ Appellant says he proposed his 24, 27, 28, 29, 36 and 37 on the law of conspiracy and that the court's refusal

to give them was prejudicial error. The record reveals that the court instructed sufficiently upon all the essential elements of conspiracy, including the requirement of proving an overt act more than the mere association of the defendants and the necessity of showing the existence of the conspiracy by independent evidence. In addition, the court instructed fully on the law of attempted extortion, and detailed the elements of the crime, defined it and declared a specific intent must be proved. For illustration, the instruction on page 100 of the clerk's transcript defines the extortioner as "every person who attempts to extort money or other property from another by means of a threat to do an unlawful injury to the person or property of the individual threatened, or of a third person . . ." Also, the "difference between 'actual extortion' and 'attempt to extort' obviously lies in the results obtained; and if one uses a threat such as I have specified with the specific intent and for the purpose that I have specified, he is guilty of attempt to extort, although he fails to induce any fear in the mind of the other or third person or fails to obtain any money or property as a result of the attempt."

Appellant complains at the court's refusal to read his proposed 103 and 104 for the reason that they dwelt upon the court's having admitted the conversations of Terry and Riddell concerning threats made to them without any proof of such threats. The answer to that complaint is that the jury knew that the recording apparatus had been attached to Riddell's telephone with his consent and both Terry and Riddell knew their conversations were being recorded. In such situation the jury had a view of such facts as would enable them to determine whether the two oil operators were induced by fear or were pretending.

Appellant says his instruction 110 applied to evidence concerning threats purportedly communicated to Riddell and Terry as the alleged agent of defendants and should therefore have been read to the jury. But if Raspona made statements to Riddell for the purpose of having them reach Terry and terrorize the latter into selling his royalties far beneath their value, it was not necessary to show that Riddell was acting as Raspona's agent or at his specific request.

Appellant contends that his proposed instruction 66 regarding the difference between preparation and attempt to commit extortion is a correct statement of the law, taken from *People* v. *Miller*, 2 Cal.2d 527 [42 P.2d 308, 98 A.L.R. 913], and that its rejection was highly prejudicial. He argues that

the court's instruction on the subject fails to define what preparation consists of and how much further an act must go beyond the preparation stage in order to become an attempt. While his 66 contained the terms necessary to deal with the issues involved, it contained other matter not essential to the appropriate instruction such as given by the court. It has too much about preparation, arranging the means necessary for the commission of extortion. There was no evidence that defendants merely suggested methods or means of committing the crime of extortion. On the contrary, the proof was of overt acts toward its commission. The court's instruction 41* was sufficient and had been expressly approved in *People* v. *Fiegelman*, 33 Cal.App.2d 100, 106 [91 P.2d 156].) In that case, as in this, the court was urged to follow *People* v. *Miller, supra*.

■■■ Appellant claims that he suffered prejudicial error by the court's instruction 19 which directed the jury that an agreement (1) involving personal property worth $500 or upwards is nonenforceable, unless there is some note or memorandum in writing of the contract signed by the party or (2) a contract for the sale of an interest in real property is nonenforceable unless there is some note subscribed by the party to be charged. He says that instruction was irrelevant; that whether the alleged agreement of Raspona and Terry was enforceable or not, the defendants could have believed it was. He says that by 19, the court interpreted the agreement of Raspona and Terry as illegal and thereby misled the jury. What the court said was that a contract for the sale of realty was not enforceable unless written and that if such agreement is made by an agent, the latter's authority to act must be in writing. Such instruction was relevant to the issues. Even though the jury might believe that Terry had promised to assign the 2 per cent override to Raspona, still there was

---

*"An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.

"There is a difference between the preparation antecedent to the offense and the actual attempt to commit it. The attempt is a direct movement toward the commission after preparations are made and must be manifested by acts which would have ended in the crime if not interrupted. Whenever the design of a person or persons to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.

"It is immaterial whether or not the crime attempted was impossible of completion if you find that it was apparently possible of completion to the person or persons so acting with the necessary intent."

no legal obligation on Terry. The very fact that the promise was not enforceable was pertinent to the good faith of defendants in their savage pursuit of Terry and Riddell to acquire the royalty though they had no right thereto. Also, it depreciated the good faith of defendants in urging that they had a contract. It reflected upon Raspona and impeached his credibility to have it shown that he had told his colleagues that he had a binding agreement with Terry. Inasmuch as there was no valid contract for the transfer of the royalty, the flimsy excuse of defendants that their acts were justifiable resentment at Terry's repudiation of his agreement pales into an insignificant flicker. The court's instruction was pertinent and sufficient; defendants' 19 would have been misleading.

 Appellant asserts that the court's instruction 23 was a fatal variance from count 2 of the amended information. He says separate offenses were charged by this instruction; that it charged attempted extortion in that defendants by wrongful use of fear or force attempted to obtain property from Riddell or Terry that unless Riddell or Terry deliver to the defendants said property, defendants would do unlawful injury to the person of Riddell or Terry. This, appellant says, was a fatal variance from count 2 which, he declares, *charged defendants* with feloniously, and by the wrongful use of force or fear, attempting to obtain property from Riddell and Terry by feloniously threatening Riddell and Terry that they, Riddell and Terry, would suffer unlawful injury unless Riddell and Terry delivered the property to defendants. Such argument aims at a distinction without a difference. The court's instruction 23 could not have misled and it is not erroneous. While the crime was alleged to have been attempted against Riddell and Terry, the People were proposing to prove threats by defendants against Riddell and Terry and attempts to acquire property from either of them by threatening either Riddell or Terry. While the allegation was of threats against both Riddell and Terry, the crime would be complete if threats had been made against either Riddell or Terry in an attempt to acquire property from either of them. It is the law that where several acts are alleged conjunctively in a single count and either constitutes the crime pleaded, the proof of any one of such acts will support a verdict of guilty on such count even though no proof of their acts had been charged. (*People* v. *Wolfrom,* 15 Cal.App. 732, 735 [115 P. 1088].) Although the pleading alleges attempted extortion of Riddell and Terry by defend-

ants, a conviction would have been warranted on proof of threats against Riddell to acquire property from Riddell *or* Terry; on proof of threats against Terry to acquire either his property or that of Riddell.

 Appellant contends that the possibility of proving threats against Terry in order to obtain property was not justified by the evidence and therefore the instruction was misleading and fatally erroneous. Such contention is based upon a presumption that the jury would have chosen the one alternative least supported by the evidence. Such presumption violates the Constitution to the effect that prejudicial error will not be presumed.

### No PREJUDICIAL ERROR IN ADMITTING STATEMENTS

 Appellant assigns as prejudicial error the court's admission of statements of Mr. Riddell concerning threats against his family. His testimony and the tape recordings disclose that among the numerous, unpleasant things poured into the ears of Mr. Riddell in the course of one telephonic conversation, Raspona said things could be straightened out. "Mr. Riddell: But why . . . talk about the kids. This guy called me up. He's splitting my head open." In a subsequent conversation, in protesting to Raspona the threats made by someone, Mr. Riddell said: "Everybody is hollering at me about this thing—splitting my head open and hanging me and burning my kids and my wife and house . . . Then when I talked to you, I said . . . something about the law, and you said: 'One thing, if you go to the law, then your family will suffer. Your kids will suffer.' Now you said that to me Don." "Mr. Raspona: Carl, no one would ever touch your family . . ." "Mr. Riddell: The people shouldn't say those things . . . Maybe he wouldn't split my head open, but he says it anyway." At a later time while the two men were discussing the matter of Mr. Terry's meeting "with the people," Mr. Riddell replied: "With all that I came out to do you a favor and somebody is going to blow my brains out and split my skull and burn my house down."

Appellant complains that such statements are inflammatory; that they painted appellant as a heinous person. Of course, it would have been less unpleasant had some of the statements of the conspirators been suppressed. That is a common grievance. But if a crime is to be adjudicated, how can the culprits be measured, the extent of their guilty be determined without knowing their thoughts as well as their deeds. An

extortion is usually effected by the use of language. If the extortionist operates by way of his pet phrases, why should they be excluded because they came into the record by the complaining witness' part of their conversation? It is true that the vulgar phrases and the intimations of injury to the family of the prosecuting witness uttered by the defendants were hurtful to them as well as the outright demands for the assignment, but that is not a good reason for excluding what was actually said by defendants to effectuate their purpose. ▮ While the asserted threats are not strictly factual proof of extortion, yet so long as such statements furnish some probative value to the issue they should not for that reason only be excluded. ▮ The argument that Riddell repeated on the telephone what had already been said by the conspirator is an assumption of bad faith on the part of the witness. In the first place, it was for the jury to determine whether the witness was dishonest in his testimony and in the second place, this court cannot presume that something was done which constitutes error. ▮ On the contrary, every intendment and presumption not inconsistent with the record must be indulged in favor of the judgment. (*Walling* v. *Kimball,* 17 Cal.2d 364, 373 [110 P.2d 58].) Since we must assume the witness did receive the several calls that threatened violence and since appellant was part of a "net work" of kindred operators, as testified by Raspona, and since such threats are similar to the threats of appellant on divers other occasions, the inference that he made them to Riddell does no violence to the cause of justice.

ADMITTING TERRY'S TESTIMONY AS TO HIS CONVERSATION
WITH APPELLANT ON JULY 9, 1953, NOT ERRONEOUS

▮ Appellant's contention that such testimony was admitted without foundation is unwise. The court heard it subject to a motion to strike. After the record was played, appellant's voice was identified by two witnesses.

The judgment of conviction of conspiracy to violate section 182 of the Penal Code, and of attempted extortion in violation of section 524, Penal Code, is affirmed.

Fox, J., concurred.

McComb, J., concurred in the judgment.

A petition for a rehearing was denied May 12, 1955, and appellant's petition for a hearing by the Supreme Court was denied May 25, 1955.