[Crim. No. 4592.   Second Dist, Div. Two.   July 11, 1951.]

THE PEOPLE, Respondent, v. JOHN HENRY GRANT, Appellant.

William Herbert Hall for Appellant.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

McCOMB, J.—From a judgment of guilty of six counts of attempted murder and from an order denying a new trial, defendant appeals.

## FACTS .

The evidence being viewed in the light most favorable to the People (respondent) the record discloses that on April 14, 1950, defendant conceived the plan of killing his wife and two children for the purpose of obtaining the proceeds of policies of life insurance in his favor so that he might meet his financial obligations.

Defendant was a skilled aircraft machinist and technician, 32 years of age, deeply in debt and unhappily married. On April 15th defendant told his wife that he was going to take a trip to deliver parts for his company and asked for an old rawhide suitcase which was kept in a closet. After receiving the suitcase he told his wife to arrange to accompany him on a trip to San Diego the next day. In the meantime defendant purchased two 6-volt batteries, an alarm clock, a sash cord, and 6 gallons of high test gasoline. With these and the suitcase he built an incendiary bomb with a timing mechanism consisting of an alarm clock. This alarm he set to go off at 2:37 p. m. Fastened to the frame of the clock was a plastic covered wire, a portion having been bared near the clapper arm of the alarm. Fastened to the clapper arm itself by means of solder was another length of wire fastened to the frame of the clock which led to a match packet and was fastened thereto by scotch tape. The wire then continued to the terminals of two 6-volt batteries where the wires again were soldered, other wires connected thereto were interwoven between the heads of the matches. Packed around the center match packet were 49 other match packets. Also in the suitcase was a small 4-ounce can of lighter fluid from the tip of which a cotton wick extended. The contrivance was constructed so that this wick would be ignited by the matches.

Adjacent to the ignition mechanism was a cardboard box containing an inner tube filled with slightly less than 5 gallons

of gasoline. There was a slow leak in this tube permitting the gasoline to escape. A number of strands of rope were tied at various positions about the inner tube. In addition the suitcase was filled with newspapers packed at various places wedging the parts of the mechanism.

When the alarm went off the clapper would strike the portion of the wire from which the covering had been removed causing the wire to burn red hot about the matches thus igniting them which in turn would result in the suitcase's exploding if enough gasoline vapor had escaped, or the gasoline would ignite and burn causing a fire. In any event the resulting fire would cause a temperature of 1,000 degrees centigrade.

On April 16th defendant told his wife that the trip had been postponed because he could not obtain transportation on the airplane to San Diego, but that they would leave on the next day.

April 17th at about 12:50 p. m. defendant drove his wife and two children to the Los Angeles International Airport. As they approached the airport defendant told his wife to get the maximum insurance for the two children and herself. She said that she did not have the correct change for the insurance to which he replied that he would get it for her. Upon arrival at the airport defendant drove into the exit to the parking lot rather than the entrance. His wife indicated to him that there were many parking places but he replied that he desired to park in the front line next to the airport, and he parked the car so that it "headed out" while the other cars were "headed in."

Defendant then purchased three tickets for his wife and children for flight 258, departure time 1:50 p. m. The aircraft was a DC-3, 21-passenger plane equipped with two engines. Before leaving the ticket counter defendant asked for and received four quarters in change for a dollar bill. When he returned to his wife he handed her five quarters to obtain the insurance. While she was getting the insurance defendant left the terminal, returned with the rawhide suitcase which he had weighed and checked at the counter, stating that he wanted the bag to go with his wife and children.

Defendant then told Mrs. Grant how to make out the insurance policies. He obtained an envelope, and at his instructions Mrs. Grant addressed it to him at their home address in Gardena. The policies were placed in the envelope

and a stamp placed thereon. There were three policies in each of which defendant was named as beneficiary. There was one policy in the sum of $10,000 upon the life of Betty W. Grant, another for $10,000 insuring Marie A. Grant, and a third for $5,000 covering Robert E. Grant. In addition defendant held a policy under which he was the beneficiary insuring the life of his wife for $500.

Defendant, his wife and children then went through a tunnel over a ramp toward an airplane which was about 35 or 40 feet from gate 23. As they stood watching the airplane, defendant suddenly placed the insurance policies and the envelope in his wife's hand and declared "I am in trouble. I am in a jam." He then walked quickly toward the terminal. When he reached the tunnel gate he turned and told his family to return to the car, adding "I am going to be arrested for sure." He then went under the counter where the luggage had been weighed.

In the meantime the rawhide suitcase had been taken by attendants to the airplane for flight 258, and when it was deposited in the pit of the airplane the lid blew open, a flame shot out and smoke poured out of the bag. The service man obtained a fire bottle and sprayed it over the suitcase while a fellow employee put a fire hose into the top of the suitcase and discharged some carbon dioxide gas, thus extinguishing the flame. Aboard the airplane at the time of the fire were the pilot, copilot and the stewardess.

The suitcase was removed and while the employees were inspecting the contents thereof defendant came running up saying "I am glad I got here before you put this bag in the airplane." Defendant then asked them to help him take it to the baggage area and upon their remaining silent, he stated "Never mind, I will take it up myself," whereupon he picked up the bag and ran into the baggage room and returned to his automobile where he was intercepted by the service manager for the United Air Lines who asked him what he was doing. Defendant replied "I am getting this thing out of here." When the manager asked him what was in the suitcase defendant stated that he did not know, it was not his suitcase, that his wife was going to San Diego and it appeared that someone was trying to play a joke on her.

Later however defendant admitted that the incendiary bomb was his and also admitted that he had not obtained any reservations for his family in San Diego, their destination.

Defendant was arrested and the suitcase turned over to

an expert for examination who testified at the trial that in his opinion the device was a time alarm bomb which would have functioned properly at 2:37 p. m.

The DC-3 airplane on which defendant had obtained tickets for his wife and children was constructed in part in the rear cargo compartment of aluminum alloy whose melting point is 659.6 degrees centigrade. An expert testified that the airplane at 2:37 p. m. would have been near Oceanside at an altitude of about 1,500 feet, and that if there had been fire in the rear compartment consuming between 5 to 6 gallons of gasoline, the heat would weaken the aluminum alloy structure of the airplane in that portion and if so weakened the plane would fall. In addition the cable controlling the tail section of the airplane is situated very near the rear baggage compartment.

Defendant was accused in six counts of attempted murder and in the seventh count with violating section 12354 of the Health and Safety Code. After the evidence had been received, in the presence of the jury, the district attorney moved for dismissal of count VII which motion was granted.

### QUESTIONS

■■■ First: *Did the dismissal of the charge of violating section 12354 of the Health and Safety Code (count VII) constitute a bar to defendant's prosecution for the offenses of attempted murder?*

*No.* Defendant argues that since both the charges of attempted murder and malicious use of explosives were predicated upon the same evidence the dismissal of count VII operated to relieve defendant from any punishment for his acts, since he had been placed in double jeopardy. Defendant answers this contention himself when he says:

"Counsel recognizes that an attempt to murder and a violation of Section 12354 of the Health and Safety Code are not the same offenses as would preclude a prosecution for both under separate counts . . ."

■■■ Though it is true that inconsistent verdicts will not be allowed to stand, it is settled that in order to be inconsistent, verdicts must be rendered in response to charges of offenses the elements of which are identical. (*People* v. *Doxie,* 34 Cal.App.2d 511, 512 [93 P.2d 1068]. See, also, *People* v. *Amick,* 20 Cal.2d 247, 249 et seq. [125 P.2d 25].)

In the present case the offenses as charged in the information, as conceded by defendant, are not identical. ■■■■ The elements of attempted murder are, (1) the intent to murder a

human being, (2) a direct but ineffectual act in furtherance of such intent, such act being more than mere preparation; while the elements constituting the crime of violating section 12354 of the Health and Safety Code* are, (1) the intent to injure, terrify or intimidate a human being, (2) placing or depositing or attempting to deposit an explosive in a place normally used by human beings.

Dissimilarities in the two offenses are apparent. On the one hand (Health & Saf. Code, § 12354), we have the element of intent to injure or intimidate which is not the same as intent to murder a human being. The intent to injure or terrify may be included with the intent to murder but certainly the reverse is not true. Next the overt act called for by the Health and Safety Code in section 12354 is the placing of an explosive in a place usually used by human beings. On the other hand the overt act necessary for attempted murder need not go so far toward the completion of the attempt as this. (*People* v. *Parrish*, 87 Cal.App.2d 853, 856 [197 P.2d 804].) Lastly it is necessary to have, under the Health and Safety Code, section 12354, an explosive as defined by section 12350 as follows: ". . . nitro-glycerine, dynamite, vigorite, hercules powder, giant powder, or any other high explosive." In the present case the expert testimony indicated that while the gasoline vapor could cause an explosion which in turn might result in the airplane's falling, such expert did not consider the gasoline a "high explosive," as referred to in the Health and Safety Code.

It is obvious that the elements constituting a violation of section 12354 of the Health and Safety Code would necessarily be included in an attempted murder. However, an attempted murder includes elements in addition to those constituting a violation of the mentioned section of the Health and Safety Code. Therefore though the violation of the Health and Safety Code was included in an attempted mur-

---

*Section 12354 of the Health and Safety Code reads: "Every person is guilty of a felony punishable by imprisonment in the State prison for not less than one year who, with the intent to injure or destroy it, or with the intent to injure, intimidate, or terrify any human being, maliciously uses, places, deposits, explodes, or attempts to explode any explosive at, in, under, or near, or takes any explosive into or near, any (a) building, vessel, boat, railroad, tramroad, cable road, train, car, depot, stable, car-house, theater, schoolhouse, church, or dwelling; (b) other place usually inhabited, frequented, or passed by human beings, or where human beings usually assemble; or who by any of such acts injures or endangers any human being."

der, an attempted murder was not included necessarily within the provisions of the crime delineated in section 12354 of the Health and Safety Code.

■ Second: *Did the trial court commit prejudicial error by submitting to the jury for its consideration the accusation charged in count VII of the information?*

*No.* The fact is that the trial court did not allow the jury to consider count VII in arriving at its verdict. After both sides had rested the district attorney moved to dismiss count VII stating: "The People move the dismissal for this reason, and for this reason alone: That the testimony of the People's witness, Chemist Ray Pinker, unequivocally reveals that gasoline, while a low velocity explosive, under no conditions can be considered a high velocity explosive or high explosive . . . under this evidence, the defendant could not lawfully be convicted of that count. For those reasons the People move the dismissal of that count alone, and for those reasons alone."

Thereupon the trial court granted the district attorney's motion. All the foregoing took place in the presence of the jury. In view of these facts it was unnecessary for the court to instruct the jury that count VII was no longer to be considered by them.

In the instructions given by the court there was no reference to the crime of malicious use of explosives and the instructions were properly limited to the application of the facts to the law defining attempted murder and the charges in counts I to VI inclusive. Had defendant wished further instruction upon this subject he should have requested the trial judge to give it. This he did not do. (*People* v. *Ahsbahs,* 77 Cal. App.2d 244, 249 [175 P.2d 33].)

■ There is likewise no merit in defendant's contention that since count VII was dismissed the jury were bound to look for other evidence than the incendiary bomb in order to find a lethal instrumentality. The dismissal of count VII did not prevent the jury from considering the evidence received relative thereto in connection with the other counts in the information. (*People* v. *Jollet,* 60 Cal.App.2d 245, 250 [140 P.2d 479].)

■ Third: *Did the trial court commit prejudicial error in refusing to instruct the jury as follows?*

"An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.

"Mere preparation, which may consist of planning the offense, or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt, irrespective of how morally reprehensible such preparations may be; but acts of a person who intends to commit a crime will constitute an attempt where they, themselves, clearly indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design.

"When a circumstance, not intended within the original design, emanates from the mind of the defendant, and it is of such a nature that it prevents a consummation of the offense, it is also a fact which prevents the defendant from being punished for the crime of attempt.

"There has been evidence adduced at this trial which purports to show that the defendant voluntarily abandoned his attempt.

"If you find from the evidence that the defendant, of his own free will and own volition, abandoned his attempt, you must acquit the defendant. If you find from the evidence, however, that the defendant sought to abandon his attempt only after he learned that his gasoline bomb had gone off prematurely, you must convict the defendant as charged, because it is no defense if one seeks to abandon his attempt after he had been detected.

"You are hereby instructed that in every crime or public offense there must exist a union or joint operation, of act and intent. The fact of voluntary abandonment of the criminal intent or purpose of the defendant, may, however, furnish some evidence of the lack of the necessary intent."

*No.* These proposed instructions defined the crime of attempt but erroneously state that when a circumstance not intended within the original design prevents consummation of the offense, it is a fact which prevents defendant from being punished for the crime of attempt. ▮ The law is settled that an unforeseen circumstance which prevents the commission of the crime attempted is not a matter of defense when the defendant is charged with the crime of attempt. (*People* v. *Fiegelman,* 33 Cal.App.2d 100, 104 et seq. [91 P.2d 156]. See, also, *People* v. *Wallace,* 78 Cal.App.2d 726, 741 [178 P.2d 771]; *People* v. *Parrish,* 87 Cal.App.2d 853, 855 et seq. [197 P.2d 804].)

█ Fourth: *Did the trial court commit prejudicial error in instructing the jury as follows?*

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows a consciousness of guilt, and the significance to be attached to such a circumstance, are matters for your determination."

*No.* Defendant contends that there is no evidence to indicate that he fled from the scene of the attempted crime. The record is to the contrary. It discloses that when he became aware that something had happened aboard the airplane, he rushed to the scene, picked up the suitcase and made a rapid exit from the field, having previously instructed his family to get into the automobile, and was prevented from fleeing simply because he was intercepted by the manager of the United Air Lines and the police. It is a fair inference from the record that had they not intercepted him he would have placed the suitcase in his car and left the airport. It is also a fair inference that such flight was planned in advance because of the fact that defendant, in parking his car at the airport, had "headed out" rather than "headed in." Clearly when the evidence supports a fair inference that defendant attempted to flee from the scene of the crime it is proper for the trial judge to instruct the jury on the doctrine of flight. (*People* v. *Arguilida*, 85 Cal.App.2d 623, 625 [193 P.2d 478].)

█ Fifth: *Did the trial court commit prejudicial error in instructing the jury as follows?*

"It is immaterial whether or not the crime attempted was impossible of completion if you find that it was apparently possible of completion to the defendant so acting with the necessary intent."

*No.* █ The elements of an attempt to commit a crime are (1) a specific attempt to commit the crime and (2) a direct ineffectual act done towards its commission. (*People* v. *Fiegelman*, 33 Cal.App.2d 100 [91 P.2d 156]. See, also, *People* v. *Arguilida*, *supra*; *People* v. *Wallace*, *supra*.)

It is not necessary that there be a "present ability" to complete the crime, nor is it necessary that the crime be factually possible. █ From the present case it is evident that defendant from his knowledge of airplanes intended that

his bomb would cause the destruction of the airplane upon which his wife and children were about to ride.

The record discloses that defendant committed overt acts directly tending toward the commission of the crime of murder in that he constructed an incendiary bomb, placed it beyond his control so that it would be delivered to the airplane, and had there not been the intervening cause of the explosion of the suitcase a fire would have occurred on the plane at the time set by him on the alarm clock, to wit, 2:37 p.m., with the result that the aluminum alloy structure of the plane would have been weakened and the plane plummeted to the ocean below, with the resultant loss of the lives not only of his wife and children but of the passengers and members of the crew of the airplane.

*People* v. *Sylva*, 143 Cal. 62, 64 [76 P. 814], relied on by defendant, is factually distinguishable from the present case. In such case defendant had been found guilty of assault with intent to commit murder. The evidence disclosed that because of the distance between defendant and his victim, it would have been impossible to injure the latter unless the gun he had was loaded, and it appears not to have been. In the present case under the authorities set forth above, where a defendant is charged with an attempt to commit a crime it is immaterial whether the attempted crime is impossible of completion if, as in the present case, completion was apparently possible to the defendant who was acting with the intent to commit the crime of murder.

The judgment and order are and each is affirmed.

Moore, P. J., and Wilson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 9, 1951.