[No. C063758. Third Dist. Feb. 7, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ANH-TUAN DAO PHAM, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, V, VI, VII, VIII, and IX of the Discussion.

[redacted]

## Counsel

Kathleen M. Scheidel, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes, Janis Shank McLean and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**ROBIE, J.**—Convicted of second degree murder, two counts of attempted murder, and discharging a firearm at an inhabited dwelling, and sentenced to 79 years to life in prison, defendant Anh-Tuan Dao Pham appeals, contending (1) there was insufficient evidence to support his convictions for murder and attempted murder; (2) the trial court erred in instructing the jury on murder, attempted murder, and consciousness of guilt; (3) the trial court erroneously and prejudicially limited his case; (4) his trial attorney was ineffective; (5) the trial court erred in allowing the jury to formulate questions for the witnesses; (6) sentence enhancements were imposed in violation of his rights under the Sixth Amendment; (7) a firearm use enhancement was wrongfully imposed on the conviction of discharging a firearm at an inhabited dwelling; and (8) his de facto sentence of life without parole amounts to cruel or unusual punishment, primarily because he was 16 years old at the time of the crimes.

In the published part of our opinion, we reject defendant's argument that there was insufficient evidence to support his convictions for attempted murder. Defendant implicitly admits there was sufficient evidence that he was the person who fired a gun a number of times into a group of people, and he

*expressly* admits that "the evidence adduced [at trial] showed that [he] had the specific intent to kill two African-American males" when he fired the gun. Defendant's complaint about his convictions is that the evidence showed the two African-American males he intended to kill "were not present in the group" when he committed the shooting, wounding two different people instead. According to defendant, under these facts he was wrongfully convicted of attempted murder based on the doctrine of transferred intent because "[i]f [he] intended to kill two specific people and in doing so wound[ed] two unintended targets, he is not guilty of the attempted murders of the two unintended targets."

For their part, the People contend defendant's attempted murder convictions were not wrongly based on transferred intent, but correctly based on concurrent intent, also known as the "kill zone" theory of attempted murder, which our Supreme Court explained in *People v. Bland* (2002) 28 Cal.4th 313 [121 Cal.Rptr.2d 546, 48 P.3d 1107]. According to the People, "it was enough that [defendant] had a generalized intent to kill people standing in the group," and "[t]he fact that [he] may have been mistaken in his belief that the African-American males were part of the group does not change the analysis."

We conclude that neither side has it right. As we will explain, defendant's convictions were not based on the jury's improper application of transferred intent to the crime of attempted murder, as defendant contends. At the same time, however, this was not a case in which defendant created a "kill zone," and thus the jury could not have convicted him of the attempted murder charges based on concurrent intent, as the People argue. Instead, defendant's attempted murder convictions are supported by substantial evidence that he specifically tried to murder two people by shooting into a group of people where he thought they were, although it turned out he was mistaken. Under well-established California law, the fact that his targets were not present at the scene of the shooting does not excuse him from criminal liability for attempted murder because factual impossibility is not a defense to a charge of attempt. Accordingly, we will affirm the attempted murder convictions.

In the unpublished part of our opinion, we agree with defendant (and the People) that a firearm use enhancement could not be imposed on his conviction for discharging a firearm at an inhabited dwelling, because firearm use was an element of that crime, and we will modify defendant's sentence to strike that enhancement. Otherwise we find no merit in defendant's challenges to his convictions and his sentence, and we will therefore affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 11:30 p.m. on February 22, 2007, an African-American teenager named Dominique Hickman was walking home from a friend's house in South Sacramento when he was struck in the back by a bullet that had first ricocheted off a hard surface. The bullet wound killed him; his body was found there the next morning.

Seven .45-caliber shell casings were found at the scene. A defect in a sound wall that appeared to have been made by a bullet was also found nearby.

A little over an hour later, it was discovered that someone had just crashed a stolen car into the garage of a house on Caymus Drive, about four miles away from where Hickman was shot. About 10 to 15 minutes later, as a group of people gathered in the front yard of the Caymus Drive residence, a white car drove past and the passenger—a young Asian male—fired a gun at the crowd numerous times. Two people were injured in the shooting. Six .45-caliber shell casings were found at the scene.

Just before the shooting, the white car had driven past the residence followed by a van that one of the residents and a friend of his recognized from an incident a week earlier. In that incident, someone had thrown a rock at the van.

In a statement to sheriff's deputies a week after the shootings, defendant admitted he was the shooter in the Caymus Drive incident. He said that when he was with his 14-year-old friend, Thomas Tran, and another friend, he got into an altercation with two Black teenagers, and one of them threw a rock and dented his mother's van. He committed the Caymus Drive shooting because he was mad about the dent. Defendant also admitted to the deputies that he told Tran, "I shot at the people [who] threw the rock at the car."

Defendant denied any knowledge of the Hickman shooting; ballistics testing revealed, however, that the cartridge casings found at the scenes of both shootings were fired from the same gun. Tests also showed gunshot residue on the passenger side of the stolen car that crashed into the Caymus Drive residence.

Defendant was charged with the murder of Hickman, two counts of attempted murder for shooting the two bullets that caused injuries in the Caymus Drive shooting, and one count of discharging a firearm at an inhabited dwelling, along with various firearm enhancement allegations.

At trial in the fall of 2009, defendant testified that on February 22, 2007, he was at his house with his 19-year-old friend, Hung Nguyen, and several others, when Hung's brother, Davis Nguyen, who was 22 or 23 years old, called and asked defendant and Hung to steal a car for him.[1] According to defendant, they went out and stole a Honda Accord and left it where Davis could pick it up, then went back to defendant's house. Later, Davis came over and said he had just shot at someone. Davis left the gun with defendant, then asked defendant and Hung to take him home and to get rid of the stolen car. After dropping Davis off, they retrieved the stolen car, then came up with the idea of driving it into the house where they thought the problem had started with the two African-American teenagers the week before. Defendant claimed he drove the stolen car into the garage. He also claimed that later, on the way to get something to eat, they drove back past the Caymus Drive residence to see what was going on, then shortly thereafter Hung said he wanted to go back and scare the people there. Defendant claimed he drove their friend's white car on the way back, and Hung was in the passenger seat. As he drove slowly past the residence, Hung shot several times. Defendant claimed he originally admitted to being the shooter because he was scared Davis might do something to him or his family if he "told on" Hung.

The jury did not believe defendant's story and convicted him of all four charges, fixing the murder at second degree. The trial court sentenced defendant to an aggregate term of 79 years to life in prison, made up of the following consecutive sentences: 15 years to life for the murder, with 25 years to life for the personal firearm use enhancement on that charge; seven years for the first attempted murder conviction, with 20 years to life for the firearm enhancement on that charge; two years four months for the second attempted murder, with six years eight months for the firearm enhancement on that charge; and one year eight months for the shooting at an inhabited dwelling charge, with one year four months for the firearm enhancement on that charge.

## DISCUSSION

### I

*Sufficiency of the Evidence of Attempted Murder*

In its ultimate form, the information charged defendant with the attempted murders of two male African-American members of a group of persons gathered outside the Caymus Drive residence. The jury found defendant guilty of those charges.

---

[1] To avoid confusion, we will refer to the Nguyen brothers by their first names.

On appeal, defendant contends there was insufficient evidence to support the attempted murder convictions because "the evidence adduced showed that [he] had the specific intent to kill two African-American males who were not present in the group" on Caymus Drive. Specifically, defendant contends the evidence showed that his intent was "to kill the two African-American males with whom [he] had an altercation the week prior," but neither of them was present in front of the Caymus Drive house when the driveby shooting occurred. In his view, because "there was no evidence adduced at trial that [he] intended to kill anyone [who was] in the group of people standing outside the house on Caymus Drive," "the prosecution clearly advocated [his] guilt under a theory of transferred intent that was disallowed as to attempted murder in" *People v. Bland, supra,* 28 Cal.4th 313.

In *Bland,* the Supreme Court explained that while, in the context of the crime of murder, intent to kill is deemed transferred or "extended" "to every person actually killed" when the defendant tries to kill a particular person but ends up killing others as well, this concept of "transferred intent" does not apply to the inchoate crime of attempted murder. (*People v. Bland, supra,* 28 Cal.4th at pp. 326–327.) According to the Supreme Court, "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id.* at p. 328.)

In defendant's view, because the evidence showed he was trying to kill two people who were not present at the scene of the shooting, the jury could not have found he intended to kill anyone who actually *was* present, and therefore the evidence was insufficient to support the charges of attempted murder. In other words, defendant's argument is that he could not be convicted of attempted murder because, while he harbored the intent to kill, the two people he intended to kill were not in the group at which he shot, even though he "mistakenly believed" they were, and his intent to kill them could not be "transferred" to the two people he ended up wounding.

The People argue that defendant's attempted murder convictions were "based on the legally correct doctrine of concurrent intent," not "the legally impermissible doctrine of transferred intent." Describing what also has been called the "kill zone" theory (see *People v. Bland, supra,* 28 Cal.4th at pp. 329–330), the People contend that "[c]oncurrent intent applies when a defendant intends to kill a particular target, and uses a mode of attack that, by

its nature and scope, shows a concurrent intent to kill persons in the vicinity of the intended target." According to the People, "the fact that [defendant] may have been mistaken in his belief that the African-American males [he intended to shoot] were part of the group [he shot at] does not change the analysis." In the People's view, the evidence that defendant "repeatedly fired a .45[-]caliber gun into the midst of a group" was sufficient to support his two attempted murder convictions. Indeed, the People contend they "could have charged [defendant] with several additional counts of attempted murder, up to at least the number of shots fired into the group."

■ We begin our analysis by rejecting the People's reliance on concurrent intent. As even the People admit in their brief, the concept of concurrent intent "applies when a defendant intends to kill a particular target, and uses a mode of attack that, by its nature and scope, shows a concurrent intent to kill persons in the vicinity of the intended target." Here, the evidence—consisting primarily of defendant's own admissions to sheriff's deputies—showed that defendant's "intended target[s]" were the two African-American teenagers he held responsible for damaging his mother's van. But the fact that defendant fired a gun at a group of people he thought included those teenagers, by itself, does not demonstrate that he had "a generalized intent to kill people standing in the group," as the People argue. Just because a defendant fires a gun repeatedly at a group of people does not necessarily mean the defendant can be convicted of as many counts of attempted murder as the number of bullets he fired. The question—which is a factual one for the jury to decide—is whether, based on the particular evidence in the case, it can be inferred that defendant had the concurrent intent to kill not only his intended target but others in the target's vicinity. (See, e.g., *People v. Vang* (2001) 87 Cal.App.4th 554, 563–564 [104 Cal.Rptr.2d 704] [in case involving shooting at two houses, "[t]he jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up"].)

Here, we need not resort to the "kill zone" theory to uphold defendant's two convictions for attempted murder, and thus we need not determine whether there was sufficient evidence for the jury to find, based on the nature of the shooting, that defendant intended to kill more people than just the two African-American teenagers he believed had damaged his mother's van. Instead, as we will explain, it was enough that he intended to kill those two persons, and it did not matter that they were not at the scene of the shooting.

As we have previously suggested, defendant finds the absence of his intended targets to be *the* critical factor in the analysis of whether his attempted murder convictions are supported by substantial evidence. Specifically, he believes the absence of his intended targets is what makes the

convictions unsupportable, because, as the Supreme Court explained in *Bland*, his intent to kill them cannot be "transferred" to the two people he actually ended up shooting.

■ What both defendant and the People have missed, however, is a basic concept of criminal law that supports defendant's convictions for attempted murder without resort to either the discredited theory of transferred intent or the overused theory of concurrent intent/"kill zone." That concept is that an attempt to commit a crime is a crime even if it would have been impossible for the defendant to complete the commission of the offense. As one court explained more than 50 years ago:

"Mere intention to commit a crime does not of itself amount to an 'attempt' as that word is employed in the criminal law. Some act done toward the ultimate accomplishment of the intended crime is necessary. [Citation.] But if a person formulates the intent and then proceeds to do something more which in the usual course of natural events will result in the commission of a crime, the attempt to commit that crime is complete. *And even though the intended crime could not have been completed, due to some extrinsic fact unknown to the person who intended it, still he is guilty of attempt.*

" 'If there is an apparent ability to commit the crime in the way attempted, the attempt is indictable, although, unknown to the person making the attempt, the crime cannot be committed, because the means employed are in fact unsuitable, or because of extrinsic facts, such as the nonexistence of some essential object, or an obstruction by the intended victim, or by a third person.' " (*People v. Siu* (1954) 126 Cal.App.2d 41, 44 [271 P.2d 575], italics added; see also *People v. Grant* (1951) 105 Cal.App.2d 347, 356 [233 P.2d 660] [for guilt of attempt to commit a crime, "[i]t is not necessary that there be a 'present ability' to complete the crime, nor is it necessary that the crime be factually possible"].) "Our courts have repeatedly ruled that persons who are charged with attempting to commit a crime cannot escape liability because the criminal act they attempted was not completed due to an impossibility which they did not foresee: 'factual impossibility is not a defense to a charge of attempt.' " (*People v. Reed* (1996) 53 Cal.App.4th 389, 396 [61 Cal.Rptr.2d 658].)

■ Here, as even defendant himself admits, the evidence supported the conclusion that defendant attempted to kill two African-Americans males he believed were in the group gathered outside the house on Caymus Drive. Unbeknownst to him, the two individuals he intended to kill were not there. Under the foregoing authorities, however, defendant cannot escape liability for his attempt to kill them just because, contrary to his belief, it turned out his intended victims were not where he thought they were. His crimes were

complete when, with the intent to kill the two teenagers, he fired shots into a group in which he thought they were. Under these circumstances, the evidence was sufficient to support defendant's two convictions for attempted murder.[2]

II–IX[*]

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## DISPOSITION

The judgment is modified to strike the firearm use enhancement (Pen. Code, § 12022.5, subd. (a)) on count four. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward of copy of the amended abstract to the Department of Corrections and Rehabilitation.

Raye, P. J., and Hull, J., concurred.

A petition for a rehearing was denied February 23, 2011, and appellant's petition for review by the Supreme Court was denied May 11, 2011, S191427.

---

[2] As we have noted, the information in its ultimate form charged defendant with the attempted murders of two male African-American members of a group of persons gathered outside the Caymus Drive residence. While the evidence showed defendant tried to kill two African-American males he *thought* were in that group, there was no evidence they actually *were* in that group. Thus, there was a deviation between the proof at trial and the language used in the amended information. Because defendant does not raise any issue regarding that deviation, and instead rests his challenge on the alleged improper application of the doctrine of transferred intent (which we have rejected), we have no occasion to address the effect, if any, of that deviation.

[*]See footnote, *ante*, page 552.