Filed 5/19/16  P. v. Estrada CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069294 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB903068) |
| ERIC JOHN ESTRADA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, J. David Mazurek, Judge.  Affirmed in part, reversed in part, and remanded.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Collette Cavalier and Tami F. Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Eric John Estrada of two counts of first degree murder (Pen. Code,[1] § 187, subd. (a); counts 1 & 2), and one count of attempted murder (§§ 187, subd. (a), 664; count 3). As to all counts, the jury additionally found true allegations Estrada committed the offenses for the benefit of a gang (§ 186.22, subd. (b)(1)(C); a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)); and a principal personally used a handgun (§ 12022.53, subds. (b), (e)(1)). As to counts 1 and 2, the jury found true allegations a principal discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)). As to counts 1 and 2, the jury also found true two special circumstances allegations: the victims were killed while Estrada was an active participant in a criminal street gang (§ 190.2, subd. (a)(22)), and Estrada committed multiple murders (§ 190.2, subd. (a)(3)). Finally, as to count 1, the jury found true allegations Estrada killed the victim in retaliation for testifying in a criminal proceeding (§ 190.2, subd. (a)(10)). The court sentenced Estrada to two terms of life in prison without parole, plus two indeterminate terms of 50 years to life in prison, plus an aggregate determinate term of 57 years in prison.

Estrada appeals, contending the jury instructions allowed the jury to improperly convict him of first degree murder based on the natural and probable consequences doctrine, the court erred in instructing the jury as to the "kill zone" doctrine and as to using flight as evidence of guilt, and the prosecutor committed prosecutorial error by

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

misstating evidence during his closing arguments. Estrada also requests we independently review the record of an in camera proceeding the court conducted under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) to determine whether the court erred in any respect.[2]

We agree the jury instructions allowed the jury to improperly convict Estrada of first degree murder based on the natural and probable consequences doctrine. We, therefore, reverse Estrada's first degree murder conviction in count 2 and remand the matter to allow the People to either retry him for this count under a direct aider and abettor theory or accept a reduction of the conviction to second degree murder.

We are unpersuaded by Estrada's remaining contentions and our independent review of the *Pitchess* proceeding did not reveal any court errors requiring correction. We, therefore, affirm the judgment in all other respects.

## BACKGROUND[3]

In 2001, Raymond Holguin, Jr. was the victim of a carjacking. Holguin testified at the preliminary hearing of the perpetrators, Varrio Redlands gang members Rubin Lopez and Mathew Manzano. Lopez later pleaded guilty to carjacking and Manzano pleaded guilty to grand theft. Estrada, also a Varrio Redlands gang member, associated with Manzano and Lopez on a frequent basis.

---

[2]    The Legislature essentially codified *Pitchess* in sections 832.5, 832.7, 832.8 and Evidence Code sections 1043 through 1047. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225, fn. 3 & 1226.)

[3]    We omit the evidence underlying the gang enhancement allegations from our summary as the evidence is not pertinent to any of the issues raised on appeal.

Four years later, Manzano and Estrada saw Holquin and his girlfriend's mother at a store. Manzano and Estrada discussed assaulting Holguin there, but decided against it because he was with a woman. Instead, they decided to go to Holquin's home, which Holquin shared with his girlfriend, his girlfriend's daughter, their baby, his mother, his brother, and his stepfather, Fernando Gurule. His girlfriend's mother was also staying at the home to help care for his two-day-old baby.

Before going to Holquin's home, Manzano and Estrada went to Armando Fonseca's house to get a gun for Manzano. Estrada already had a gun with him. Fonseca tried to talk Manzano and Estrada out of going to Holquin's home, but he was unsuccessful. Fonseca gave Manzano a gun, and Manzano and Estrada drove separate cars to Holguin's house.[4]

The same evening, Holquin was in the living room of his home, lying on a couch with his baby on his chest, watching a movie. Holquin's girlfriend and her mother were sitting on the couch watching the movie with Holquin. Holquin's girlfriend heard what sounded like tools dropping in the garage. About 30 seconds later, Gurule came into the living room followed by a tall, lanky, masked man, later identified as Manzano, who held a gun to Gurule's head. When Gurule tried to hit Manzano's hand down, Manzano shot Gurule in the back of the head.

---

[4] Fonseca and Estrada were charged and tried together. The jury acquitted Fonseca of the charges against him. Manzano was tried in a separate, earlier proceeding. Manzano's jury convicted him of first and second degree murder and found true special circumstance and firearm enhancement allegations. On appeal, we modified the sentence for the second degree murder conviction and affirmed the court's judgment in all other respects. (*People v. Manzano* (July 13, 2012, D058661, D060795) [nonpub. opn.].)

4

Manzano then turned toward Holguin, yelled "What's up now, fool," and shot Holquin at close range about six times as the baby lay on Holquin's chest. Holquin's girlfriend's mother pushed Holquin's girlfriend to the floor and covered her as more shots were fired. Holquin's girlfriend could hear and feel bullets passing by her. Seconds after the shooting ended, Manzano and Estrada left.

Holquin's girlfriend went to Holquin and the baby. Holguin was bleeding from the neck, and both of the baby's feet had gunshot wounds. Holquin's girlfriend attempted to stop the bleeding as her mother called the police.

A neighbor was outside when he heard a banging, crashing noise, and then screaming coming from Holguin's garage. The neighbor saw a tall, skinny man, later identified as Manzano, "bouncing up" against the screen door. He also heard someone screaming, "What's up, bitch? How do you like that now?" A few minutes later, Manzano came out of the garage. He had a noticeable limp. The neighbor noticed another, shorter person with a medium build, later identified as Estrada, there, too.

The neighbor heard Manzano say, "I think they got me. We gotta go. I think they got me. I think I got stabbed." Estrada asked, "Do you think you can still drive?" Manzano replied, "I don't know, but we gotta get the fuck out of here. We gotta go now." Manzano and Estrada got into a waiting car and drove away. The neighbor then knocked on Holguin's door. Although nobody answered, the neighbor could hear screams coming from inside.

Holguin was shot with seven bullets and died from multiple gunshot wounds to his head, neck and chest. Gurule died from a single gunshot wound to his head. Nine

5

cartridge casings were found at the scene. Ballistics and other evidence showed there were two shooters using two guns.

Later that night, Manzano went to a local hospital with a gunshot wound to his lower back. A police detective attempted to perform a gunshot residue test on Manzano, but Manzano was uncooperative and no test was conducted within the time frame in which residue would be expected to remain on a person's hands.

A criminalist analyzed two sets of shoeprints found at the crime scene. The criminalist concluded one set of shoe prints could have been made by a size 13 Fila shoe belonging to Manzano, and the other set was probably made by a size eight and a half or a size nine Nike shoe. A deputy sheriff measured Estrada's feet. Estrada's right foot measured nine inches long, and his left foot measured eight and three quarter inches long.

Daniel Leivas, a one-time Varrio Redlands gang member, spoke with police detectives from jail.[5] Estrada told Leivas he and Manzano went to Holquin's home to kill Holguin because Holguin had "snitched on one of the homies." When Estrada saw Manzano kill one of the men, Estrada changed his mind and did not want to shoot. Manzano told Estrada he "better shoot too," so Estrada started "shooting everywhere." Which is when Holquin's baby was shot. Estrada thought Manzano was going to die, so he drove away without him.

Ernesto Regalado, another Varrio Redlands gang member, spent time in prison with Manzano. During their time together, Regalado and Manzano had several

---

[5] The detectives recorded the interviews. At trial, Leivas denied the interviews occurred and denied making any of the statements attributed to him.

discussions about the murders. Manzano told Regalado that Holguin was killed in retaliation for Holquin's testimony against Manzano. Manzano explained how he and Estrada obtained a gun from Fonseca, drove to Holquin's home in separate vehicles, and parked in separate locations. Manzano said they saw a man in the garage as they walked up to Holguin's home. They asked the man where Holguin was, and then shot the man in the head as they walked into the house. Manzano saw Holguin on the couch and started shooting him. Estrada started shooting into the couch, too. As Manzano turned to run out, he felt a gunshot to his back. Manzano drove to Fonseca's house, and Fonseca drove him to the hospital.

## DISCUSSION

### I

### A

Before trial, Estrada moved under *Pitchess*, *supra*, 11 Cal.3d 531, for discovery of information in a detective's personnel records. The detective had previously been investigated for falsifying reports and for perjury, which the prosecutor disclosed to defense counsel under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) (collectively *Brady* incidents). Defense counsel brought the motion to discover whether the detective's personnel records contained information related to these incidents or to other similar conduct by the detective.

The court granted the motion, agreeing to review the detective's personnel records in camera to determine whether they contained discoverable information related to dishonesty or falsification of reports. After conducting an in camera review, the court

7

determined the only discoverable information in the detective's personnel records was related to *Brady* incidents and had likely already been provided to defense counsel by the prosecutor. Nonetheless, the court ordered the names and contact information of the potential witnesses to the *Brady* incidents provided to defense counsel, subject to a protective order.

B

At Estrada's request, and with no objection by the People, we have independently reviewed the record of the *Pitchess* proceeding. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 330.) We conclude the court did not err in the determinations it made during the in camera review of the detective's personnel records.

C

Nonetheless, during our review, we noted one of the potential witnesses to the *Brady* incidents whose name and contact information were provided to defense counsel was a former prosecutor who had since become a superior court judge. The judge later decided a few ancillary posttrial matters in this case, none of which are being challenged on appeal. At the point the judge decided the matters, Estrada was representing himself and it does not appear from the record either Estrada or the judge knew, or would have had reason to know, the judge's name had been disclosed to defense counsel as a potential witness to potential impeachment incidents. It also does not appear from the record appellate defense counsel knew of the disclosure or had an opportunity to evaluate whether it presented any arguable appellate issues. Accordingly, we requested further briefing from the parties on whether the judge's handling of the ancillary posttrial matters

8

violated any of Estrada's constitutional or statutory rights and, if so, how the violation should be reviewed and remedied.

In his supplemental briefing, Estrada points out the judge may have been disqualified under several provisions of Code of Civil Procedure section 170.1. This code section lists numerous grounds upon which a party may bring a motion to disqualify a trial judge. Among these grounds are the judge's personal knowledge of disputed evidentiary facts concerning the proceeding or where a person aware of the facts might reasonably entertain a belief that the judge is unable to be impartial. (Code Civ. Proc., § 170.1, subds. (a)(1)(A) & (a)(6)(A)(iii).) The procedure for bringing such a motion is specified in Code of Civil Procedure section 170.3, and the exclusive means for reviewing a ruling on such a motion is through a petition for writ of mandate. Consequently, we may not review in this appeal whether the judge should have been disqualified from handling the ancillary posttrial matters under Code of Civil Procedure section 170.1. (See *People v. Peoples* (2016) 62 Cal.4th 718, 786-787 (*Peoples*).)

However, we may review whether the judge's involvement in the ancillary posttrial matters violated Estrada's right to due process of law. (*Peoples*, *supra*, 62 Cal.4th at p. 787.) As the parties both acknowledge in their supplemental briefs, the federal due process clause "justifies judicial disqualification only under the ' "most 'extreme facts.' " ' [Citations.] To establish a federal due process violation, ' "there must exist ' "the probability of actual bias on the part of the judge." ' " ' " (*Peoples*, at p. 787.) We discern no such probability on the record before us.

9

At most, the record shows the judge may have been a potential witness to potential impeaching conduct by one of the detective's involved in this case. The impeaching conduct, if it occurred, predated the trial by about three years. The disclosure of the judge's name and contact information to defense counsel predated the trial by about six months and predated the judge's handling of the posttrial matters by about a year. There is no indication in the record defense counsel or a defense investigator ever contacted the judge to determine what, if anything, he knew about the potential impeaching conduct.

During trial, defense counsel examined the detective at length about the potential impeaching conduct. Nothing in defense counsel's examination revealed any involvement by the judge as a witness or potential witness in this case. In addition, nothing in the judge's interactions with Estrada revealed any involvement by the judge as a witness or potential witness in this case. More importantly, nothing in the judge's interactions with Estrada or the judge's rulings in this case revealed any actual bias toward Estrada. Indeed, Estrada is not challenging the propriety of the judge's rulings. We, therefore, conclude, the record does not show the judge's handling of the ancillary posttrial matters deprived Estrada of due process of law.

II

A

Using tailored versions of CALCRIM Nos. 400, 401 and 402, the court instructed the jury on aiding and abetting as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call this person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly

10

committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

"To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

"The defendants are charged in Count One with the murder of [Holquin], in Count Two with the murder of [Gurule] and in Count Three with the attempted murder of [Holquin's baby]. [¶] You must first decide whether a defendant is guilty of the murder

11

of [Holquin]. If you find the defendant is guilty of this crime, you must then decide whether he is guilty of [the] murder of [Gurule] and [the] attempted murder of [Holquin's baby].

"Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that a defendant is guilty of [the] murder of [Gurule] and [the] attempted murder of [Holquin's baby], the People must prove that: [¶] 1. The defendant is guilty of [the] murder of [Holquin]; [¶] 2. During the commission of [the] murder of [Holquin] a coparticipant in the crime committed the crime or crimes of [the] murder of [Gurule] and [the] attempted murder of [Holquin's baby]; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in defendant's position would have known that the commission of [the] murder of [Gurule] and/or [the] attempted murder of [Holquin's baby] was a natural and probable consequence of the commission of the murder of [Holquin].

"A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If either the murder of [Gurule] and/or [the] attempted murder of [Holquin's baby] was committed for a reason independent of the common plan to commit the murder of [Holquin], then the commission of the murder of [Gurule] and/or [the] attempted murder

12

of [Holquin's baby] was not a natural and probable consequence of [the] murder of [Holquin]."

B

Relying on *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), which the California Supreme Court decided after Estrada's trial, Estrada contends we must reverse his conviction in count 2 because the court's aiding and abetting instructions improperly allowed the jury to find Estrada guilty of aiding and abetting the first degree murder of Gurule under the natural and probable consequences doctrine. We agree.

In *Chiu*, the Supreme Court held "an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Chiu*, *supra*, 59 Cal.4th at pp. 158-159, italics omitted.)

The Supreme Court explained, "[f]irst degree murder … is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] … Although … an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences

13

doctrine, especially in light of the severe penalty involved." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

In this case, the court's aiding and abetting instructions did not comport with the Supreme Court's holding in *Chiu*, *supra*, 59 Cal.4th 155 because the instructions allowed the jury to convict Estrada of the first degree murder of Gurule under a natural and probable consequences doctrine. Indeed, this was the prosecutor's only theory of Estrada's culpability for Gurule's murder.[6]

Nonetheless, the "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Chiu*, *supra*, 59 Cal.4th at p. 166*.*) Thus, consistent with the disposition in *Chiu*, we conclude the appropriate remedy for the court's instructional error is to reverse Estrada's conviction in count 2 and allow the People to either retry the offense under a direct aiding and abetting theory or accept a reduction of the conviction to second degree murder. (*Id.* at p. 168.)

---

6    Since the People did not argue Estrada directly aided and abetted the first degree murder of Gurule and the court did not instruct the jury on this theory as to count 2, we need not consider whether the jury may have based its verdict on a valid ground. (See *Chiu*, *supra*, 59 Cal.4th at p. 167 [when a trial court instructs on one legally correct and one legally incorrect theory of guilt, reversal is required unless the record shows beyond a reasonable doubt the jury based its verdict on the legally correct theory].)

14

III

A

As part of its attempted murder instructions, the court informed the jury of the "kill zone" theory of specific intent contained in CALCRIM No. 600. Specifically, the court informed the jury, "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. In order to convict the defendant of attempted murder of [Holquin's baby], the People must prove that the defendant not only intended to kill [Holquin] but also either intended to kill [Holquin's baby], or intended to kill everyone in the kill zone. If you have a reasonable doubt whether the defendant intended to kill [Holquin's baby] or intended to kill [Holquin] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [Holquin's baby]."

B

Estrada contends the court prejudicially erred in giving the kill zone instruction because it misstates the law.[7] We are not persuaded by this contention.

The California Supreme Court first articulated the kill zone theory in *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*). The Supreme Court started from the premise that "[t]o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged

_____

7       The California Supreme Court is currently reviewing a case involving the issue of whether a trial court properly instructed a jury on the kill zone theory of attempted murder. (*People v. Canizales* (2014) 229 Cal.App.4th 820, review granted Nov. 19, 2014, S221958.)

attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id.* at p. 328.)

The Supreme Court then explained, "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.' 'The intent is concurrent … when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, … consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. … Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." (*Bland*, *supra*, 28 Cal.4th at pp. 329-330.)

16

Nonetheless, "[j]ust because a defendant fires a gun repeatedly at a group of people does not necessarily mean the defendant can be convicted of as many counts of attempted murder as the number of bullets he fired. The question—which is a factual one for the jury to decide—is whether, based on the particular evidence in the case, it can be inferred that defendant had the concurrent intent to kill not only his intended target but others in the target's vicinity." (*People v. Pham* (2011) 192 Cal.App.4th 552, 559.)

Here, the evidence showed Manzano and Estrada went to Holquin's home to kill Holquin in retaliation for Holquin's testimony in a prior case. To accomplish this goal, they first learned Holquin's location from Gurule, then killed Gurule. Once they spotted Holquin, they fired at least seven bullets at him while he was lying on the couch with his baby on his chest and his girlfriend and her mother were sitting nearby. A jury could reasonably determine from this evidence Manzano and Estrada employed means creating a zone of harm around Holquin and they intended to harm all of the people within the zone, including Holquin's baby.

*People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*), upon which Estrada principally relies, is factually distinguishable. In *McCloud*, the People charged the defendants with the attempted murder of 46 people who were within an area in which the defendants fired 10 bullets. (*Id.* at pp. 799-800.) The court held a kill zone instruction was not warranted because there was no evidence the defendants specifically intended to kill all 46 people with just 10 bullets. There was also no evidence it was even possible for them to kill 46 people with just 10 bullets or that they believed or had reason to

17

believe it was possible. (*Ibid.*) To the contrary, there was evidence it was impossible for them do so. (*Id.* at p. 800.)

No such impossibility exists in this case. The number of shots fired, the confined space in which they were fired, and their close range to Holquin and his family members permitted a reasonable inference Manzano and Estrada harbored the specific intent to kill every living being within the vicinity of the shots, including Holquin's baby. (See *McCloud*, *supra*, 211 Cal.App.4th at p. 800, fn. 5, discussing *People v. Vang* (2001) 87 Cal.App.4th 554.) Accordingly, Estrada has not established the court erred in giving a kill zone instruction.

IV

A

Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

Consistent with section 1127c, the court instructed the jury with a modified version of CALCRIM No. 372 as follows: "If a defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of

18

his guilt. If you conclude that a defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that a defendant fled or tried to flee cannot prove guilt by itself."

B

Estrada contends the trial court erred in giving the flight instruction because his identity as one of the perpetrators was a contested issue in the case. However, the California Supreme Court long ago rejected this position and held, "If there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight. [Citation.] 'The jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt. [Citation.] The jury's need to know these things does not change just because identity is also an issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.' " (*People v. Mason* (1991) 52 Cal.3d 909, 943 & fn. 13, modified on another point as recognized in *People v. Solomon* (2010) 49 Cal.4th 792, 839; see *People v. Elliott* (2012) 53 Cal.4th 535, 584 [no error in giving flight instruction where the sole question for the jury was whether defendant was the perpetrator and there was no evidence of defendant's flight apart from his identification as the perpetrator].) We are bound by the court's holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

19

# V

## A

### 1

As part of his closing argument, the prosecutor stated to the jury, "And we know that the shoes leading up, as we talk about two pair, you had one size 13 Filas; that, according to [a criminalist], he received the black Filas that were being worn by Manzano that night. And the tread pattern was consistent with a size 13 Fila. Now, we also know that the other shoe—remember, according to [the criminalist], he got a shoe that had similar tread pattern but it was a [nine] and a half and it was too big. He thought [the shoeprint] was more like an [eight] and a half to a [nine]. And what did you hear? [Estrada's] shoe size is an [eight] and [three] quarters to a [nine]—or his foot size."

Estrada's counsel objected to the prosecutor's statement on the ground it misstated the evidence. The court overruled the objection and then instructed the jury, "And, ladies and gentlemen, in this case since it was so long, when the attorneys argue, they're arguing or stating things that they believe were said. I don't think anybody is going to intentionally misstate anything. But if you think they are incorrect or you need to check something—[the court reporter] will be happy with this—you can always ask [the court reporter] to read back what was said exactly so you'll know."

The prosecutor continued, "You heard the deputy come in. The rather huge, large gentlemen that measured his feet. One foot was [eight] and [three] quarters, the other one was [nine]. He put a ruler up to it, measured. As we all know, you measure your feet,

20

that is usually your shoe size. You don't measure as a 10 and say I want a 13. It doesn't work that way. So again, he indicated, 'Yeah, it's less than a [nine] and a half. I think it's an [eight] and a half, but it's less than a [nine] and a half—[eight] and a half, [nine]. And what do we have? Consistency. Corroboration."

2

In her closing argument, defense counsel responded, "I would like to just briefly talk about [Estrada's] shoe size. Now, the prosecutor brought in a person who went down to the jail the night before his testimony and took a tape measurement of [Estrada's] foot, came in and gave the inch measurement of [Estrada's] foot, which is incompetent evidence. That is not a shoe size. Perhaps the prosecutor should have gone to the property of [Estrada] and gotten his shoe. It's in property when he was arrested. There's a pair of shoes in there. Size [seven], not size [eight] and a half or[nine]."

The prosecutor objected to the latter statement and the court sustained the objection. Defense counsel then continue, "It's through innuendo and incompetent evidence that they want you to believe that the officer measured [Estrada's] foot, found the shoe size that matches one of the prints. We didn't get that information from anyone, whatsoever. So this is created so that you can think, 'Oh, yeah. Yeah, there was a footprint. It matched.' It didn't match. There is no match."

3

The prosecutor addressed the shoeprint evidence one more time in his final remarks to the jury, stating, "Now counsel says, 'Oh, [Estrada's] size shoe was [seven]. They didn't bring in the shoes to show [seven]. There's no evidence of that. What

evidence?  You look at evidence.  What evidence do we have?  His shoe was [eight] and [three] quarters and one was [nine].  And we know, according to [the criminalist], the shoe size was less than [nine] and a half; and he said basically [eight] and a half or [nine]."

B

Estrada contends we must reverse his convictions for prosecutorial error because the prosecutor misstated the foot size evidence in his closing argument.  Our review of prosecutorial error claims is guided by well-established rules.  "A prosecutor's conduct violates a defendant's federal constitutional rights when it comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]' [Citation.]  The focus of the inquiry is on the effect of the prosecutor's conduct on the defendant, not on the intent or bad faith of the prosecutor. [Citation.]  Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Bennett* (2009) 45 Cal.4th 577, 594-595.)

During closing arguments, a prosecutor has " 'wide latitude to discuss and draw inferences from the evidence at trial.  [Citation.]  Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Smith* (2003) 30 Cal.4th 581, 617.)  Nonetheless, "[f]or a prosecutor to misstate the evidence is prosecutorial misconduct." (*People v. Davis* (2005) 36 Cal.4th 510, 550.)  "A prosecutor's 'vigorous'

22

presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' " (*People v. Hill* (1998) 17 Cal.4th 800, 823.)

In this case, the transcript of the closing arguments, which we have quoted at length above, shows the prosecutor twice misspoke about the foot size evidence: once in his initial arguments and once in his rebuttal arguments. The first time he corrected himself. The second time he did not. Assuming, without deciding, these slips were prosecutorial error, Estrada "must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

Notwithstanding the prosecutor's slips, we think it is apparent from the closing arguments as a whole the prosecutor did not intend to argue there was specific testimony about Estrada's shoe size. Rather, he intended to invite the jury to infer Estrada's foot size in inches approximated his shoe size, which defense counsel vigorously disputed.

In addition, at the outset of the trial and again after closing arguments, the court instructed the jury, "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence. … Only the witnesses' answers are evidence." We presume the jury followed this instruction. (*People v. Pearson* (2013) 56 Cal.4th 393, 440.)

23

Further, during closing arguments after the prosecutor misspoke for the first time, the court invited the jury to request testimony read back if the jury thought any of counsel's remarks about the evidence were incorrect. The jury accepted this invitation and requested to have the testimony of the officer who measured Estrada's foot size read back. Consequently, we conclude Estrada has not shown there was a reasonable likelihood the jury understood or applied the prosecutor's remarks about the foot size evidence in an improper or erroneous manner.

DISPOSITION

Estrada's conviction for first degree murder in count 2 is reversed. The People may elect to retry him for this count under a direct aider and abettor theory or accept a reduction of the conviction to second degree murder. If the People elect the latter option, the court is directed to resentence Estrada for this count and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

                                              McCONNELL, P. J.

WE CONCUR:

BENKE, J.

HUFFMAN, J.

25